KEY HOMES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 64129.     Filed April 28, 1958.

*Morris Berick, Esq.*, for the petitioner.
*Clarence C. Roby, Esq.*, for the respondent.

MULRONEY, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax for the fiscal year ended October 31, 1953, in the amount of $3,580.29. The issue is whether the petitioner must include in income certain portions of the purchase price of sales of real estate made in the fiscal year 1953, where such portions are placed in a savings account with the financing institution and assigned as collateral security to protect the financing institution from loss through default by the purchaser of the real estate.

### FINDINGS OF FACT.

The stipulated facts are incorporated by this reference.

Key Homes, Inc., hereinafter called the petitioner, was organized under the laws of Ohio on January 15, 1952. Its Federal income tax return for the period here involved was filed with the district director of internal revenue at Cleveland, Ohio. Petitioner reported its income on an accrual basis.

Petitioner is engaged in the business of constructing and selling residential real estate. During the fiscal year 1953 the petitioner sold five houses under a financing arrangement with the South Side Federal Savings & Loan Association, hereinafter called South Side. South Side was unwilling to make first mortgage loans to the prospective purchaser sufficient to cover the difference between the purchase price and the cash downpayment. Petitioner agreed, in connection with each mortgage granted by South Side, to deposit a certain sum in a savings account with South Side as additional security for the loans made. The agreement under which this deposit was made is as follows:

### AGREEMENT

Savings Acct. No.
Loan No.

This Agreement, entered into this ____ day of _____, 19____, by and between SOUTH SIDE FEDERAL SAVINGS AND LOAN ASSOCIATION, hereinafter known as the party of the first part, and Key Homes, Inc., hereinafter known as the party of the second part,

WHEREAS, In consideration of said party of the first part having approved the loan to _____ in the sum of $_____, secured by first mortgage on property at Keystone Road, Parma _____, and second party does hereby agree to place $_____ in a Savings Account with said party of the first part, in the name of Key Homes, Inc. (Main Office), said Savings Account to be held as additional security for said loan of $_____ to _____.

It is mutually agreed by the parties hereto that in the event of default on said mortgage note, any loss sustained by the party of the first part may be charged against said Savings Account of the party of the second part until same is exhausted, provided, however, that it is further mutually agreed by the parties hereto that if the said mortgagors shall faithfully discharge the agreements and

covenants in the note of _____ to said party of the first part, and the mortgage securing same, until said loan is reduced to the principal sum of $_____ then said Savings Account shall be released as additional collateral in connection with said loan and left under the sole control of said party of the second part.

Petitioner, in connection with each separate real estate transaction, also authorized South Side in a written agreement to create the savings account required for each mortgage by withholding a certain portion from the proceeds of such mortgage. The savings account was in the petitioner's name and drew interest which was regularly credited to the petitioner.

The following schedule shows the five sales made by the petitioner in the fiscal year 1953, the cash paid by the purchaser of each house, the amount of the first mortgage, the selling price, and the amount of the savings account at South Side in the petitioner's name, together with the point of release of the savings account:

| | | | | | |
|---|---|---|---|---|---|
| Downpayment | $4,500 | $4,500 | $5,000 | $3,000 | $4,435 |
| 1st mortgage | 13,000 | 13,400 | 12,000 | 14,900 | 13,500 |
| Selling price | 17,500 | 17,900 | 17,000 | 17,900 | 17,935 |
| Savings account | 1,000 | 900 | 2,000 | 2,500 | 1,200 |
| Point of release of savings account | 11,500 | 12,000 | 9,000 | 11,000 | 11,700 |

These transactions were completed in the fiscal year 1953 and no further obligation remained between the petitioner and the respective purchasers.

Respondent determined that the amounts placed in savings accounts by the petitioner under its agreement with South Side, in connection with the five sales listed above, were includible in petitioner's gross income for the fiscal year 1953.

OPINION.

The issue before us is whether the amounts withheld in fiscal year 1953 by South Side under its agreement with the petitioner and placed in a savings account in petitioner's name as additional collateral for first mortgage loans made by South Side to the purchasers of real estate from the petitioner were includible in petitioner's income in that year.

Petitioner's position is that the amounts in the segregated savings accounts were not realized by it in fiscal year 1953 because of certain contingencies which must be met before the amounts are released by South Side and that until such contingencies are removed, petitioner has no present right to the money. We do not agree. In *E. J. Gallagher Realty Co.*, 4 B. T. A. 219, the taxpayer, who was on an accrual basis, was a builder of residential property and the financing arrangement used in the sale of such property was substantially similar to the arrangement devised in the present case. Taxpayer sold the houses for a small downpayment and the balance was financed by mortgages

given by the purchaser to a building and loan association. Such mortgages were for amounts in excess of those which the building and loan association loaned on similar property and, to protect itself, the association withheld such excess, which was placed in a deposit account with the association. The taxpayer then executed an assignment of such deposit to the association as collateral security for the loan. When the mortgage had been reduced to a point where the security afforded by the property was sufficient for the amount outstanding, the assignment became null and void. We held that the amounts withheld by the association in the deposit accounts were includible in the taxpayer's income. After pointing out that the execution of the deed to the purchaser, the mortgage by the purchaser to the association, and the assignment by the taxpayer of the withheld deposit to the association were simultaneous transactions, we said at page 222:

The fact that a portion of the purchase price for the property was assigned or left in the hands of the building association to insure mortgage payments by the purchaser and that the actual payment to the taxpayer was deferred does not, in our opinion, justify the taxpayer in excluding these amounts from income when it kept its books on the accrual basis.

The *Gallagher* case was followed in the recent case of *Barham, et al.* v. *United States*, —— F. Supp. —— (E. D. Va., 1957). There the facts were slightly different in that the financing institution, instead of creating a savings account for the taxpayer builder and taking an assignment of such account as collateral security, issued its stock certificates to the taxpayer for the withheld amount and took an assignment in the certificates from him, with the provision that the assignment would be released when the mortgagor had reduced the mortgage to a certain point. The District Court recognized that the taxpayer could not determine precisely when the stock certificates would be released from the assignment but pointed out that, nonetheless, the "taxpayer had received an asset which could increase or decrease in value and upon which dividends were paid and received."

Respondent's argument is further supported by a line of cases involving the dealer's reserve accounts. There a financing institution which purchases notes from the taxpayer, who is usually engaged in selling automobiles, trailers, or similar items, withholds from the taxpayer a certain percentage of the proceeds of the note and credits it to a dealer's reserve account. It is usually agreed that this account will at all times be maintained at a certain percentage of the outstanding balance of all the notes purchased by that financing institution from the taxpayer and any excess in the account over the agreed percentage is paid to the taxpayer. No attempt is made, as a rule, to segregate the amounts withheld in connection with each individual transaction. Instead, the fund is a revolving one, with the balance set at a fixed percentage. There is usually no provision made for interest

on the balance in the reserve account. In these cases we have consistently held that the amounts retained by the financing institution and placed in the reserve account are includible in the gross income of the taxpayer for the period in which the notes were received by the taxpayer. *Evans Motor Co.*, 29 T. C. 555; *Albert M. Brodsky*, 27 T. C. 216; *Blaine Johnson*, 25 T. C. 123, revd. 233 F. 2d 952; *Texas Trailercoach, Inc.*, 27 T. C. 575, revd. 251 F. 2d 395 (C. A. 5, 1958). In the *Evans* case we noted our unwillingness, with all due respect to the two United States Courts of Appeals, to follow them on this question of the treatment of these reserves.

We must emphasize that in the instant case there are distinguishing features which make the case even stronger for the respondent than in the dealer's reserve cases cited above. Here, the petitioner had indicia of ownership other than a mere credit notation in a reserve account. The petitioner received interest regularly on its savings account with South Side. Each savings account retained its individuality and was geared to a particular transaction rather than being thrown into a single reserve account with a continuing balance fixed at a certain percentage. Petitioner is entitled to full control over each savings account as the mortgagor in that particular transaction reaches a certain point in his mortgage obligation to South Side. South Side does not have complete discretionary control over the savings account, as in the *Texas Trailercoach* case, *supra*, and in the *Blaine Johnson* case, *supra*, to charge against the savings account, amounts that it decides the petitioner may at any time owe in "any connection whatsoever." We think that these facts indicate, even more strongly than in the dealer's reserve cases, that the amounts in the savings accounts are includible in petitioner's gross income in the year in which the real estate transactions were completed.

We think that it is immaterial whether the transaction here is to be regarded as a single transaction involving petitioner, South Side, and the purchaser of the real estate, or as two separate transactions. *Texas Trailercoach, Inc., supra.* Petitioner argues that it is uncertain whether it will ever receive the amounts in the savings accounts. However, there is always the possibility that a purchaser or a debtor will default in his obligation but that contingency is not sufficient to defer the accruing of income that has been earned. *Spring City Foundry Co.* v. *Commissioner*, 292 U. S. 182. Any failure in the future to receive these amounts is adequately provided for in the bad debt or loss provisions of the Internal Revenue Code.

Petitioner also cites *Commissioner* v. *Cleveland Trinidad Paving Co.*, 62 F. 2d 85, in support of its position. However, that case is clearly distinguishable. There, substantial portions of the agreed consideration were retained by municipalities for which the taxpayer had completed pavement construction contracts. The retained amounts

were to guarantee maintenance of the pavements by the taxpayer for certain specified periods, and the question before the court was whether the amounts retained were accruable. The court held for the taxpayer, on the ground that it was not obliged "to accrue that which is but contingently earned." Here, each of the five real estate transactions was completed in the year before us and there is no doubt that the selling price of each of the five houses was *earned* in that year. Unlike the situation in *Cleveland Trinidad Paving Co., supra*, there was no guaranty on the part of the petitioner to maintain the houses after they were sold.

*Decision will be entered for the respondent.*