WESTERN OAKS BUILDING CORPORATION, ET AL.,[1] PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 421–66—423–66.   Filed January 22, 1968.

*Roy C. Lytle*, for the petitioner.
*J. C. Linge*, for the respondent.

---

[1] Cases of the following petitioners are consolidated herewith: Don Brown Home Builders, Inc., docket No. 422–66; and Donald I. Brown and Donetta Brown, docket No. 423–66.

### OPINION

These facts present us with several issues for decision: (1) Are the petitioners who used the accrual method of accounting required to include in their gross income the face amount of the savings accounts when received? (2) If so, are they entitled to deduct as an addition to a reserve for bad debts the face amount of the savings accounts or some portion thereof? (3) Are the petitioners who used the cash method of accounting required to include in their gross income the fair market value of the savings accounts when received?

### The Accrual Method Petitioners

*The Inclusion Issue.*—The petitioners, Western Oaks and Home Builders, who used the accrual method of accounting, contend that they are not required to include as gross income the face amounts of the savings certificates when received, but that they are required to include the amounts of such accounts only when they are released and available to them. This same contention was considered and rejected by this Court in *Key Homes, Inc.*, 30 T.C. 109 (1958), affirmed per curiam 271 F. 2d 280 (C.A. 6, 1959). In that case, the petitioner was also engaged in the business of building and selling homes. Because of the

purchasers' inability to make downpayments sufficient to cover the difference between the selling price and the amount that the lending institution could loan on the property, the parties adopted financing arrangements essentially similar to those used in the case before us. The petitioner received a restricted savings account for the difference between the amount that could be loaned on the property and the amount of the downpayment which the purchaser could make. The petitioner could not withdraw the restricted savings account until payments by the purchaser had reduced the outstanding balance of the loan to an amount specified in the assignment of collateral agreement. This Court held that the petitioner, who used the accrual method of accounting, was required to treat as a receipt of gross income the amount of the restricted savings account when received, notwithstanding that the petitioner could not withdraw such amounts until some time in the future. Our decision in *Key Homes* was affirmed per curiam by the Sixth Circuit (271 F. 2d 280 (1959)) and has been followed in several decisions of this and other courts. *Bolling* v. *Commissioner*, 357 F. 2d 3 (C.A. 8, 1966), affirming on this issue T.C. Memo. 1964–143; *United States* v. *Wood*, 352 F. 2d 522 (C.A. 5, 1965); *Lewis Building & Supplies, Inc.*, T.C. Memo. 1966–159; *Warren G. Morris*, T.C. Memo. 1963–139; *Carl B. Holland*, T.C. Memo. 1963–108. See also *E. J. Gallagher Realty Co.*, 4 B.T.A. 219 (1926).

Despite our earlier decision in *Key Homes* and the subsequent acceptance of that decision, the petitioners ask us to reconsider the issue. The petitioners argue that the affirmance of *Key Homes* was based on an erroneous interpretation of *Commissioner* v. *Hansen*, 360 U.S. 446 (1959), a decision involving dealer reserves, and that to impose a tax on the petitioners when they have no right to withdraw the funds imposes an inequitable tax burden upon them. We have re-examined the basis for the *Key Homes* decision, together with the pertinent principles of tax law, and we have concluded that this Court's decision and the Sixth Circuit's affirmance in reliance on *Hansen* were proper.

Section 451(a) of the Internal Revenue Code of 1954 [3] provides:

SEC. 451. GENERAL RULE FOR TAXABLE YEAR OF INCLUSION.

(a) GENERAL RULE.—The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period.

Section 1.451–1(a), Income Tax Regs., provides in part: "Under an accrual method of accounting, income is includible in gross income when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy." In *Spring City Co.* v. *Commissioner*, 292 U.S. 182 (1934),

---

[3] All statutory references are to the Internal Revenue Code of 1954.

the Supreme Court said at page 184: "it is the *right* to receive and not the actual receipt that determines the inclusion of the amount in gross income. When the right to receive an amount becomes fixed, the right accrues."

*Spring City Co.* dealt with the accruability of an account receivable arising out of a sale of merchandise, when the purchase price was immediately due and payable but the actual payment was postponed. It is clear, however, that even when payment is not due until some time in the future, as in the case of an installment sale, an accrual method taxpayer, not using the installment method, must include the amount of the payment in income at the time of the sale, i.e., when the taxpayer acquires the right to receive that amount in the future. *First Savings & Loan Association,* 40 T.C. 474 (1963); *George L. Castner Co.,* 30 T.C. 1061 (1958). Moreover, when property is sold, it is the face amount of the right, not its fair market value, which must be treated as received and includable in income. *First Savings & Loan Association, supra.*[4] It is true that where there is "real doubt and uncertainty" that a claim for payment will ever be turned into cash or its equivalent "A taxpayer * * * is not required to accrue an item like this as income and pay income tax thereon, but is permitted to wait until the uncertainty is removed in some way." *Cuba Railroad Co.,* 9 T.C. 211, 215 (1947). Cf. *H. Liebes & Co.* v. *Commissioner,* 90 F. 2d 932 (C.A. 9, 1937); *Georgia School-Book Depository, Inc.,* 1 T.C. 463 (1943). However, "The fact that there is always the possibility that a purchaser or debtor may default in his obligation is not sufficient to defer the accruing of income that has been earned." *First Savings & Loan Association, supra* at 487.

Under these general rules, if the petitioners in the present case had taken and held a note of the purchaser, instead of a restricted account, these notes would clearly have been includable in income in the year of the sale at face amount. *Spring City Co.* v. *Commissioner, supra; First Savings & Loan Association, supra.* Similarly, if the petitioners had taken such notes and immediately assigned them or sold them to the savings and loan association, subject to the same right of release as in the present case, to induce the savings and loan association to take on the transaction, the face amount would again be includable in the year

---

[4] We are aware of sec. 1.453–6(a)(1), Income Tax Regs., which provides in part:

In transactions included in paragraph (b)(2) of § 1.453–4, that is, sales of real property involving deferred payments in which the payments received during the year of sale exceed 30 percent of the selling price, the obligations of the purchaser received by the vendor are to be considered as an amount realized *to the extent of their fair market value* in ascertaining the profit or loss from the transaction. * * * [Emphasis added.]

The parties have not argued the applicability of this regulation to this case. In any event, we interpret it as being inapplicable to accrual method taxpayers. See *First Savings & Loan Association,* 40 T.C. 474; *George L. Castner Co.,* 30 T.C. 1061; Bittker, Federal Income, Estate and Gift Taxation 821 (3d ed. 1964).

of sale. *Commissioner* v. *Hansen, supra; General Gas Corporation*, 33 T.C. 303 (1959), affd. 293 F. 2d 35 (C.A. 5, 1961), certiorari denied 369 U.S. 816 (1962).

The petitioners agree that in the case supposed, the seller, having received obligations of his purchaser subject to no restrictions on disposition, is taxed at the time of receipt, whether or not he subsequently takes steps to postpone or otherwise restrict immediate realization on their value. Here, however, they argue, the seller never received an unrestricted passbook or savings and loan share but only a contingent right to receive funds on their release by the savings and loan association in the future. Instead of arising from a separate voluntary transaction to obtain working capital, the petitioners argue that the restrictions in this case were a part of the original transaction, necessary to the consummation of the sale. This difference, the petitioners argue, is sufficient to take this case outside the rules governing accrual of a fixed right to receive income. We disagree. In the first place, it is immaterial how, or from whom, the petitioners in this case acquired the unconditional right to receive future payments. In any event, they acquired such a right at the time of the sale of the property, and under the accrual method of accounting which they used for tax purposes, the face amount of the obligation must be treated as income at that time. The facts that the funds could not be withdrawn until some future time and that they would not become available if the purchaser failed to perform his obligation would not alter the accruability of the right if it had been received directly from the purchaser, and do not change the tax consequences merely because the right is acquired from the lending company.

A proper reading of *Commissioner* v. *Hansen, supra*, resolving the tax treatment of dealer reserves, also supports our conclusion. The typical dealer reserve transaction involved the credit sale of an automobile, trailer, or other equipment for an agreed price. The purchaser made a cash downpayment and delivered an installment note to the seller for the balance of the purchase price plus a time or finance charge. The dealer then sold or discounted this note to a finance company, the dealer guaranteeing payment. The finance company remitted a percentage, usually 90 or 95 percent, of the price of the note to the dealer in cash, and credited the balance to a dealer reserve account. Under the terms of this arrangement, the dealer reserve account served as collateral for the dealer's liability to the finance company as guarantor of the notes or otherwise. This account was to be maintained at a specified percentage of the total unpaid balance of notes which the dealer discounted with the finance company. Periodically, the finance company released to the dealer any excess in his account. The question involved was the proper year of accrual of amounts in the dealer re-

serve account—the year in which the amounts were credited to the reserve or the year in which they were released.

Some of the Courts of Appeals viewed this transaction as a "three-cornered" one: The dealer agreed to sell the automobile to the purchaser for a cash downpayment; the purchaser agreed to borrow the balance of the purchase price from the finance company and to direct its payment to the dealer; however, it was agreed that the finance company could retain a portion of the loan as a reserve to secure payment of all the loans which it made for the dealer and that the reserve would be released to the dealer at a later date when it was no longer needed to secure performance of the loan. So viewing the transaction, those courts held that the dealer acquired merely a contingent right to receive the amounts withheld by the finance company and that such amounts were not taxable to the dealer until they were received. *Hansen* v. *Commissioner*, 258 F. 2d 585 (C.A. 9, 1958), revd. 360 U.S. 446 (1959); *Texas Trailercoach* v. *Commissioner*, 251 F. 2d 395 (C.A. 5, 1958), reversing 27 T.C. 575 (1956).

According to the petitioners' argument, the dealer-reserve transaction as so reconstructed or interpreted by these Courts of Appeals is very similar to the facts of the case before us. However, in *Commissioner* v. *Hansen, supra*, the Supreme Court held that those lower courts had "assumed facts which are contrary to the records and are wholly without substance" (360 U.S. at 462), and that the transaction had to be viewed in two steps—a sale of the commodity followed by a separate sale of the note. Thus, the petitioners argue that the Supreme Court's decision in *Hansen* was based upon facts not analogous to those in the *Key Homes* case or the case before us and that therefore it is not applicable in resolving the issue before us.

We disagree. After finding that the case before it involved two transactions, the Court could have held that the taxpayer by reason of its use of the accrual method of accounting was required to include in income the face amount of the note which was paid for the automobile and which was received at the time of the sale regardless of its subsequent disposition of the note. However, the Court viewed the question as:

whether amounts of purchase price withheld by finance companies as security to cover possible losses on installment paper purchased from dealers, who employ the accrual method of accounting, constitute income to them *at the time the withheld amounts are recorded on the books of the finance companies as liabilities to the dealers.* [Emphasis added. 360 U.S. at 463.]

The Court concluded that the dealer acquired a fixed right to receive amounts withheld and credited to the reserve at the time of the sale of the *notes* to the finance company, and that the dealer would eventually

receive the funds either in cash or as payment on debts owed by it to the finance company. Hence, although the facts in the dealer-reserve cases are significantly different, the Supreme Court reached its decision by principles of law that are relevant to the issue before us, and its decision supports the *Key Homes* decision.

We therefore hold that the face amount of the restricted savings accounts and savings and loan shares were includable in gross income when received by the petitioners using the accrual method of accounting.

*The Deduction Issue.*—The next issue is whether the petitioners are entitled to a deduction for an addition to a reserve for bad debts. The petitioners argue that if the restricted savings accounts must be treated as income when received, the impact of that result should be mitigated by allowing them to establish a reserve for bad debts and to treat the amounts of the restricted savings accounts as additions to that reserve. In support of this contention, the petitioners point to *Bolling* v. *Commissioner*, 357 F. 2d 3 (C.A. 8, 1966), reversing T.C. Memo. 1964–143; *Foster Frosty Foods, Inc.* v. *Commissioner*, 332 F. 2d 230 (C.A. 10, 1964), reversing 39 T.C. 772 (1963) ; and *Wilkins Pontiac* v. *Commissioner*, 298 F. 2d 893 (C.A. 9, 1961), reversing 34 T.C. 1065 (1960). This argument is apparently based on the assumption that the petitioners' relationships to the lender are those of guarantors. Cf. H. Rept. No. 2157, 89th Cong., 2d Sess. (1966), 1966–2 C.B. 905, 906 fn. 2.[5] As such, it is clear that they are not entitled to any deduction for an addition to a bad debt reserve for the years in controversy.

Section 166(g), which was enacted in 1966,[6] provides the exclusive right of a guarantor or endorser to deduct additions to a reserve for bad debts.[7] In the case of taxable years ending before October 22, 1965, a guarantor is entitled to such a deduction only if he made a claim

---

[5] We do not mean to imply that if the parties had argued that the petitioners were "creditors" we would reach a different result.

[6] Act of Nov. 2, 1966, Pub. L. 89–722, 80 Stat. 1151.

[7] SEC. 166. BAD DEBTS.

,(g) RESERVE FOR CERTAIN GUARANTEED DEBT OBLIGATIONS.—

,(1) ALLOWANCE OF DEDUCTION.—In the case of a taxpayer who is a dealer in property, in lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) for any taxable year ending after October 21, 1965, a deduction—

(A) for a reasonable addition to a reserve for bad debts which may arise out of his liability as a guarantor, endorser, or indemnitor of debt obligations arising out of the sale by him of real property or tangible personal property (including related services) in the ordinary course of his trade or business ; and

(B) for the amount of any reduction in the suspense account required by paragraph (4) (B) (i).

(2) DEDUCTION DISALLOWED IN OTHER CASES.—Except as provided in paragraph (1) no deduction shall be allowed to a taxpayer for any addition to a reserve for bad debts which may arise out of his liability as guarantor, endorser, or indemnitor of debt obligations.

for such a deduction before such date.[8] The committee report explains that for purposes of this provision, "The taxpayer may have claimed the deduction in his original return for the taxable year, in an amended return, or in a claim for refund, if such return, amended return, or claim for refund was filed before October 22, 1965." H. Rept. No. 2157, 89th Cong., 2d Sess. (1966), 1966-2 C.B. 905, 912.

In the facts before us, we have no evidence of any claim for an addition to a bad debt reserve before the time when the petitioners filed their original brief on March 16, 1967. On their returns, they showed the amounts of the restricted savings accounts as deferred income, but nothing was said about a reserve for bad debts. Congress has now spoken and laid down the rules as to when a guarantor may establish a reserve for bad debts and deduct the additions thereto; and under these rules, it is altogether clear that the petitioners are not entitled to such a deduction.

### The Cash Method Petitioners

As to the petitioners who used the cash method of accounting for tax purposes, the Browns, we reject the respondent's contention that they were required to include in gross income the face amounts of the restricted savings accounts when received. We hold that these accounts were taxable only as amounts could be withdrawn. In determining the income derived from the sale of property by a cash method taxpayer, a right to receive future income is not included in the computation of the "amount realized" under section 1001(b) unless that right is the equivalent of cash. *Estate of Coid Hurlburt*, 25 T.C. 1286 (1956); *Curtis R. Andrews*, 23 T.C. 1026, 1034-1035 (1955); *Estate of Clarence W. Ennis*, 23 T.C. 799 (1955); *Nina J. Ennis*, 17 T.C. 465 (1951); *Harold W. Johnston*, 14 T.C. 560 (1950). This is true even though for other purposes that right may be considered to have a fair market value. *Estate of Coid Hurlburt, supra*. Where the right is the equiva-

---

[8] Sec. 2. (a) Except as provided in subsections (b) and (c), the amendments made by the first section of this Act shall apply to taxable years ending after October 21, 1965.

(b) If—

(1) the taxpayer before October 22, 1965, claimed a deduction, for a taxable year ending before such date, under section 166(c) of the Internal Revenue Code of 1954 for an addition to a reserve for bad debts on account of debt obligations described in section 166(g)(1)(A) of such Code (as amended by the first section of this Act), and

(2) the assessment of a deficiency of the tax imposed by chapter 1 of such Code for such taxable year and each subsequent taxable year ending before October 22, 1965, is not prevented on December 31, 1966, by the operation of any law or rule of law,

then such deduction on account of such debt obligations shall be allowed for each such taxable year under such section 166(c) to the extent that the deduction would have been allowable under the provisions of such section 166(g)(1)(A) if such provisions applied to such taxable years.

(c) Section 166(g)(2) of the Internal Revenue Code of 1954 (as amended by the first section of this Act) shall apply to taxable years beginning after December 31, 1953, and ending after August 16, 1954. [80 Stat. 1152]

lent of cash, it is included in the income of a cash method taxpayer in the year of receipt at its fair market value. *Joseph Marcello, Jr.,* 43 T.C. 168, 180 (1964).

In determining whether the right to receive income in the future is equivalent to cash, the test is whether the debtor's promise to pay is embodied in "notes, mortgages, or other evidence of indebtedness such as commonly change hands in commerce." *Harold W. Johnston,* *supra* at 565. The obligations must, "like money, be freely and easily negotiable so that it readily passes from hand to hand in commerce." *Nina J. Ennis, supra* at 470.

The evidence shows that the petitioners did not receive a freely negotiable evidence of indebtedness at the time of the sale. Apparently, they received only the executed "Assignment of Collateral" forms, containing the terms of the restriction, and did not even receive a savings account passbook or share certificate. In any event, it is clear that they did not receive a negotiable instrument. See Uniform Commercial Code, sec. 3–104(1) ; Okla. Stat. Ann. tit. 12A, sec. 3–104(1) (1963). Moreover, J. B. Fiddler, executive vice president of Local Federal Savings & Loan Association, the lender in most of the transactions under consideration in this case, testified that "You might go for months and not hear anything about a savings account being sold, and then maybe in the next week * * * you will hear about two or three sales." This testimony shows that the pledged accounts did not "readily pass from hand to hand in commerce."

Because the accounts, or shares representing such accounts, were not easily negotiable and freely exchanged in commerce, we find that they were not the equivalent of cash and therefore not includable in the income of the cash method petitioners when received.

*Decision will be entered under Rule 50.*