Poplar Hills Development Corporation v. Commissioner.
Poplar Hills Dev. Corp. v. Comm'r
Docket No. 6890-65.
United States Tax Court
T.C. Memo 1968-208; 1968 Tax Ct. Memo LEXIS 94; 27 T.C.M. (CCH) 1026; T.C.M. (RIA) 68208; September 19, 1968. Filed *94 Held, that the petitioner, an accrual method taxpayer, may not, in computing gain upon sales of houses, exclude from the amounts realized upon such sales any portion of the sales price represented by portions of loans placed to its credit in restricted savings accounts. Held, further, that the petitioner is not entitled to deduct, as additions to a reserve for bad debts, any portion of amounts placed in such restricted savings accounts. William N. Pierce, Shenandoah Bldg., Roanoke, Va., for petitioner. Marion B. Morton, for respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax against the petitioner in the amount of $2,771.66 for the taxable year ended July 31, 1962, and in the amount of $11,776.77 for the taxable year ended July 31, 1963. The first issue is whether the petitioner, an accrual basis taxpayer, in computing the gain to be reported upon sales of houses, must include the full amount of 1027 the selling price of the houses where portions of the loans obtained to supply the selling price of the houses were placed in savings accounts to the credit of the petitioner but were pledged as security to the *95 lending institution and could be withdrawn by petitioner only on certain conditions. If so, there is presented the alternative issue of whether the petitioner is entitled to deduct one-half of the amounts placed in such savings accounts in each year as additions to a reserve for bad debts under section 166(g) of the Internal Revenue Code of 1954. Findings of Fact Some of the facts have been stipulated and the stipulations are incorporated herein by this reference. Petitioner is a corporation engaged in building and sllling residential houses in the Lynchburg, Virginia, area. It was organized under the laws of Virginia on August 17, 1961, and its principal office is located in Lynchburg. Its first taxable year ended July 31, 1962, and it filed its Federal income tax return for that year and its return for the taxable year ended July 31, 1963, with the district director of internal revenue at Richmond, Virginia. It maintains its books and records, and reports its income for Federal income tax purposes, upon an accrual method of accounting. During the years in question, the houses which petitioner built were sold by it for about $14,000 to $15,000. Many of the buyers to whom petitioner *96 sold the houses did not have sufficient funds to make substantial down payments. Thus, in order to arrange financing for the sales of its houses, petitioner entered into an oral agreement with the Lynchburg Federal Savings and Loan Association of Lynchburg, Virginia (hereinafter referred to as "Association") whereby, prior to commencing construction of a house, petitioner would apply to Association for a separate loan on such house. The loan was in the nature of a construction loan but was in an amount approximating the sales price petitioner expected to obtain when the house was completed and sold. The petitioner in each case gave Association its interest-bearing note for the loan, secured by a first deed of trust on the property on which the house was to be built. Since Association did not normally make loans on real estate in excess of 80 percent of the appraised value of the property securing a loan, only approximately that percentage of the loan proceeds was disbursed to petitioner as construction progressed, and approximately 20 percent of the loan in each case was placed in a separate interest bearing savings account with Association in the petitioner's name, but was pledged *97 by petitioner to Association as additional security. In each instance petitioner executed a "collateral pledge agreement" with Association which provided that the pledged savings account would be released to the petitioner when "the principal balance of the loan has been reduced twice the amount of the pledged collateral [the savings account] or portion thereof," or at "the discretion of the Board of Directors" of Association. When a house was completed and sold the buyer, after paying closing costs and in some cases a down payment (rarely in excess of 5 percent of the sales price), assumed petitioner's note payable to Association for the loan which petitioner had previously obtained on the property. In the event of default by a buyer, the petitioner could be called upon by Association to pay its note that had been assumed by the buyer, as provided in the deed of trust. The "collateral pledge agreement" executed by the petitioner with Association in connection with the savings accounts provided that in the case of any such default Association should notify the petitioner thereof. It was provided therein that the petitioner should have the right to either pay the amount of the default *98 or take an assignment of the note and deed of trust, without recourse. It was further provided that if the default was not remedied within 30 days Association had the right to take whatever steps were necessary through foreclosure or other proceedings, and that any resulting loss to Association would be charged against the savings account. As of July 31, 1963, none of the savings accounts had been released by Association to the petitioner. Also up to that time Association had not found it necessary to foreclose on any of the loans that had been made to the petitioner. The first foreclosure involved in connection with sales of petitioner's houses occurred on August 21, 1964, and was in connection with a loan which petitioner had obtained for a house later sold to Norman B. Mosimann and his wife. On 1028 Mosimann's default, the deed of trust was foreclosed by Association and, since a deficiency remained, the savings account of $2,500 pledged for this loan was applied against the loan, and, in addition, petitioner was billed, and subsequently paid, $200.19 for the deficiency that remained after application of the savings account. A second foreclosure occurred on July 31, 1965, which resulted *99 in a charge of $2,195.74 against the savings account pledged to secure the loan in that case (this being the full amount of the savings account). A third foreclosure occurred on October 28, 1965, and a fourth on March 1, 1966, resulting in charges of $1,863.74 and $2,128.18, respectively, against savings accounts which petitioner had pledged to secure the loans in those cases. At three of the foreclosure sales Association purchased the houses which were sold under foreclosure. Petitioner purchased the house sold under the foreclosure on July 31, 1965, paying $14,574.98, and resold it on February 28, 1966, for $15,350, paying a sales expense of $500. The following tabulation shows the total amounts of loans made by Association to petitioner during the taxable years ended July 31, 1962 through July 31, 1966, and assumed by buyers of its houses, and the loan balances due Association as of the end of each of such taxable years: Fiscal YearEnding
Loans Assumed
Loan Balances DueEnd of Year
7/31/62
$100,900
$100,649.55
7/31/63
502,251
590,090.00
7/31/64
200,300
764,768.45
7/31/65
13,250
737,183.66
7/31/66
698,364.40
In its books and in its Federal income tax return for the taxable year ended July 31, 1962, *100 the petitioner showed sales of $107,700 which it reduced by an amount of $8,750, resulting in reported gross receipts of $98,950. The amount of $8,750 was described in the return as "Discount of second mortgages to fair market values." This amount represented one-half of the amounts placed in savings accounts and pledged to Association in that year. In its books and in its return for the taxable year ended July 31, 1963, the petitioner showed sales of $435,009.95 which it reduced by an amount of $40,907.50, resulting in reported gross receipts of $394,102.45. The amount of $40,907.50 was described in the return as "Estimated Excess of Face Value over Fair Market Value of Pledged Second Mortgages Receivables." Ths amount represented one-half of the amounts placed in savings accounts and pledged to Association in that year. The references by petitioner in its returns to "second mortgages" was petitioner's characterization of the pledged savings accounts. Actually, no second mortgages were involved. In its returns for the taxable years in question the petitioner did not, in Schedule F relating to bad debts, claim any deductions either on the specific charge-off method or on the reserve *101 method. In its balance sheet for each of the years in question, the petitioner included as an asset the full amount of the pledged savings accounts as of the end of each year, but showed an offsetting liability of one-half of such amount, which in each case was referred to as deferred income from second mortgage notes. In neither of such balance sheets, nor in its balance sheets accompanying its returns for the three subsequent years, did it include any amount denominated as a reserve for bad debts. In its Federal income tax return for the taxable year ended July 31, 1965, the petitioner claimed a deduction of $290 as "Note of N.B. Mosimann Charged Off as Uncollectible." This obligation of Mosimann to petitioner arose out of a transaction separate from the sale of the house to Mosimann. This was the first deduction of a bad debt that petitioner had claimed on any of its returns. The next bad debt deduction claimed by the petitioner was on its income tax return for its taxable year ended July 31, 1966, being in the amount of $888.74 and described as "Loss on Foreclosure of Lot 8, Blk. 3 Hypo Savings." In its income tax return for the taxable year ended July 31, 1966, the petitioner *102 reported as income an amount of $1,288.05 as "Collection on Deferred Income." In the notice of deficiency the respondent increased sales, and hence taxable income as reported by the petitioner, for the taxable years ended July 31, 1962 and July 31, 1963, by the respective amounts of $8,750 and $40,907.50 referred to above. Opinion The petitioner first contends that it properly excluded from its computation of gain derived from the sales of houses in the taxable years in question one-half of the amounts placed to its credit in savings accounts and pledged by it to Association as security for the loans made by Association to finance the sales of the houses. It is petitioner's contention that the savings accounts which it had been required to pledge to Association were similar to receivables which would have been created if it had taken back second mortgages on the houses sold. It therefore contends that since it was not free to withdraw the funds in the savings accounts until substantial reductions in the loan balances had been made, and since any losses which Association might sustain as a result of defaults by purchasers of houses would constitute charges against such savings accounts, *103 it was proper to discount by one-half the amount of the pledged accounts in computing its taxable income. The respondent, on the other hand, contends that the petitioner must report as gain the full amount of the excess of the amount realized upon the sales of houses over its adjusted basis (section 1001(a) of the Internal Revenue Code of 1954), and that the amount realized, within the contemplation of section 1001(b) of the Code, includes the full amount of the loans which the petitioner had placed upon the properties and which the buyers assumed as a part of the purchase price. The respondent further contends that since the petitioner computed its income on an accrual method of accounting, it is immaterial that a portion of the loans made by Association, representing a part of the purchase price paid by the buyers, was placed in restricted savings accounts. We agree with the respondent. It is well settled that in computing the amount realized on a sale of property there must be included the amount of the seller's mortgage obligation assumed by the purchaser. See Crane v. Commissioner, 331 U.S. 1; James M. Hays, 13 B.T.A. 291; and Walter F. Haass, 37 B.T.A. 948. Furthermore, we have *104 heretofore taken the position that in the case of a taxpayer employing an accrual method of accounting, there is not to be excluded from the amount realized on a sale any portion of the selling price which is placed in a restricted savings account as security for the lending agency. See Western Oaks Building Corp., 49 T.C. 365; Key Homes, Inc., 30 T.C. 109, affd. (C.A. 6) 271 F. 2d 280, and cases cited therein; and Bolling v. Commissioner, (C.A. 8) 357 F. 2d 3, affirming on this issue a Memorandum Opinion of this Court. See also Commissioner v. Hansen, 360 U.S. 446. Alternatively, the petitioner contends that in effect it was a guarantor of the loans here involved and that as such it is entitled to deduct for each of the taxable years in question a reasonable addition to a reserve for bad debts. In support of this contention, the petitioner cites Bolling v. Commissioner, supra, reversing on this point a Memorandum Opinion of this Court; Foster Frosty Foods, Inc. v. Commissioner, (C.A. 10) 332 F. 2d 230, reversing 39 T.C. 772; and Wilkins Pontiac v. Commissioner, (C.A. 9) 298 F. 2d 893, reversing 34 T.C. 1965. It also relies upon section 166(g) of the Internal Revenue Code of 1954, [1] *106 *105 as enacted by Act of November 2, 1966, Pub. Law 89-722, 80 Stat. 1151, which deals with the right of a guarantor, endorser, or indemnitor to deduct additions to a reserve for bad debts. Section 2 of Pub. Law 89-722 provides that for taxable years ending before October 22, 1965, a guarantor is entitled to such a deduction only if he made a claim for such a deduction before such date. [2] *107 1030 In Western Oaks Building Corp., supra, we rejected a similar contention advanced by the taxpayer. There, as here, amounts of restricted savings accounts excluded by the taxpayer from taxable income for years ending before October 22, 1965, were shown on the returns as deferred income, and it did not, prior to October 22, 1965, claim deductions for additions to a reserve for bad debts, as required by Pub. Law 89-722. [3] *109 Indeed, the evidence in the instant case shows that the only bad debt deductions claimed by the petitioner were claimed for subsequent years under the specific chargeoff method rather than as additions to a reserve for bad debts. Thus, even if the petitioner in the instant case qualifies as a guarantor, endorser, or indemnitor, which the respondent contests, we are constrained to the view that the same result must be reached here as in Western Oaks Building Corp., supra, in which we stated in part: "Congress *108 has now spoken and laid down the rules as to when a guarantor may establish a reserve for bad debts and deduct the additions thereto; and under these rules, it is altogether clear that the petitioners are not entitled to such a deduction." Decision will be entered for the respondent. Footnotes
1. Section 166(g) of the Code provides in part as follows: (g) Reserve for Certain Guaranteed Debt Obligations. - (1) Allowance of deduction. - In the case of a taxpayer who is a dealer in property, in lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) for any taxable year ending after October 21, 1965, a deduction - (A) for a reasonable addition to a reserve for bad debts which may arise out of his liability as a guarantor, endorser, or indemnitor of debt obligations arising out of the sale by him of real property or tangible personal property (including related services) in the ordinary course of his trade or business; * * * * * * (2) Deduction disallowed in other cases. - Except as provided in paragraph (1) no deduction shall be allowed to a taxpayer for any addition to a reserve for bad debts which may arise out of his liability as guarantor, endorser, or indemnitor of debt obligations. 2. Section 2 of Pub. Law 89-722 provides as follows: Sec. 2(a) Except as provided in subsections (b) and (c), the amendments made by the first section of this Act shall apply to taxable years ending after October 21, 1965. (b) If - (1) the taxpayer before October 22, 1965, claimed a deduction, for a taxable year ending before such date, under section 166(c) of the Internal Revenue Code of 1954 for an addition to a reserve for bad debts on account of debt obligations described in section 166(g)(1)(A) of such Code (as amended by the first section of this Act), and (2) the assessment of a deficiency of the tax imposed by chapter 1 of such Code for such taxable year and each subsequent taxable year ending before October 22, 1965, is not prevented on December 31, 1966, by the operation of any law or rule of law, then such deduction on account of such debt obligations shall be allowed for each such taxable year under such section 166(c) to the extent that the deduction would have been allowable under the provisions of such section 166(g)(1)(A)if such provisions applied to such taxable years. (c) Section 166(g)(2) of the Internal Revenue Code of 1954↩ (as amended by the first section of this Act) shall apply to taxable years beginning after December 31, 1953, and ending after August 16, 1954. [80 Stat. 1152]
3. In H. Rept. No 2157 which deals with Pub. Law 87-722 it is stated in part: The Internal Revenue Service takes the position that a dealer in property is not entitled to take a current deduction, by use of a reserve for bad debts, for losses he expects to arise in subsequent years because of his sale with recourse of customer debt obligations. For example, if a dealer sells an article under a conditional sales contract and then sells the contract to a bank with the bank reserving the right to collect any bad debts from the dealer, the Internal Revenue Service holds that an addition to a reserve for bad debts on account of the dealer's contingent liability to the bank cannot be deducted for income tax purposes. The Treasury's position has been sustained in the Tax Court of the United States, but three circuit courts of appeal have held that a current deduction can be so taken against the future losses. The Commissioner of Internal Revenue has announced that he will not follow the circuit court decisions. The bill is designed to settle the existing controversy as to the proper treatment of such cases for both future and past years. * * * Claims for taxable years ending before October 22, 1965. - Subsection (b) of section 2 of the bill provides that if (1) the taxpayer before October 22, 1965, claimed a deduction, for a taxable year ending before such date, under section 166(c) of the Code (relating to reserve for bad debts) on account of debt obligations described in paragraph (1)(A) of section 166(g) * * * then such deduction on account of such debt shall be allowed for each such taxable year under section 166(c) to the extent that the deductions would have been allowable under the provisions of paragraph (1)(A) of section 166(g) if such provisions applied to such taxable years. The taxpayer may have claimed the deduction in his original return for the taxable year, in an amended return, or in a claim for refund, if such return, amended return, or claim for refund was filed before October 22, 1965. * * *↩