Samuel S. Steele and Margaret G. Steele v. Commissioner.
Steele v. Commissioner
Docket No. 2303-68.
United States Tax Court
T.C. Memo 1969-177; 1969 Tax Ct. Memo LEXIS 119; 28 T.C.M. (CCH) 884; T.C.M. (RIA) 69177; August 28, 1969, Filed Roland J. Mestayer, Jr., and Thomas R. Ward, 1347 Deposit Guaranty Bank Bldg., P.O. Box 427, Jackson, Miss., for the petitioners. Robert G. Faircloth, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Year
Deficiency
1963
$73,261.89
1964
25,837.89 The principal issue is whether petitioner Samuel S. Steele, who used the completed contract method of accounting in reporting income, should have included in his income the face amount of the fair market value of second mortgage notes he received upon the sales of houses. If he should have reported the face amount of the notes, then we must determine (1) the proper method of reporting income for the period from July through *121 December 1964, and (2) whether he is entitled to deduct a reasonable addition to a reserve for bad debts representing the estimated uncollectibility of the second mortgage notes included in income. Findings of Fact Some of the facts are stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Samuel S. Steele and Margaret G. Steele are husband and wife who resided in Mobile, Alabama, at the time they filed their petition in this case. They filed their joint Federal income tax returns for the taxable years 1963 and 1964 with the district director of internal revenue at Birmingham, Alabama. For a number of years Samuel S. Steele (herein called petitioner) individually was engaged in the real estate, insurance and mortgage business in Mobile. During the years 1960 through July 1964 he was also engaged in the business of constructing houses in an individual capacity. Doing business as S.S. Steele & Co., a proprietorship, petitioner advertised 8 basic floor plans, and offered assistance in arranging financing for houses to be constructed on lots owned by his customers. When he reached agreement with a lot owner for the construction *122 of a house, a written contract was signed setting forth the terms of the agreement, including lot description, sales price and terms of payment. Purchasers agreed to install their own water and sewage systems and to clear the building site. In some transactions the purchasers paid cash for their houses or arranged their own financing. For all practical purposes such transactions were cash sales to petitioner. Many other purchasers were able to obtain only partial financing from their own resources and from third parties. In such transactions the third party who provided primary financing received a first mortgage; and petitioner accepted a promissory note secured by a second mortgage representing the difference between the sales price and primary financing where this difference was not excessive. Petitioner, aided by his employees, determined that second mortgages were not excessive when the amount of the primary financing covered the cost of constructing and conveying houses to the respective purchasers. The amount of the second mortgage represented petitioner's gross profit on each sale. He attempted to earn a gross profit of 20 percent on the sales price of each house, and he *123 did not accept second mortgages in excess of that amount. The second mortgage notes were usually in face amounts of $100 to $3,000 with most of them ranging between $1,000 and $1,500. They were payable over 10 to 15 years and bore interest at 8 percent per annum. The first mortgagees were savings and loan associations which made an independent credit investigation and appraisal prior to determining the amount and terms of loans they would make on each house. If the lending institution did not approve the loan, petitioner would not accept the contract. When the lending institution agreed to make the loan, petitioner then determined whether to take a second mortgage, had a title search conducted, obtained a title insurance binder and arranged for the closing of the agreement. After this closing petitioner arranged to begin construction of the house. The houses were of the low cost residential type, usually in rural areas and ranged in selling price from $6,095 to $8,595 complete except as to water and sewage systems to be installed by the purchasers within 60 days after completion. The houses usually consisted of three bedrooms and averaged 960 to 1,200 square feet in size, although *124 some had two or four bedrooms and were respectively smaller or larger in size. They were built with aluminum siding or brick veneer on piers with treated sills and treated floor joists. The houses had a 886 subfloor and hardwood floors except that the kitchen and bathrooms were tiled. Most models had one bathroom, though some had 1 1/2 or 2 bathrooms. The houses were equipped with plumbing and forced air heating systems, but air conditioning was optional. The houses construced by petitioner did not meet the standards of construction sufficient to make them eligible for loans guaranteed by the Federal Housing Administration or Veterans Administration. Petitioner felt that he would have had to expend about $2,000 more in constructing the houses in order to meet those standards and that the resultant increase in price would cut into his sales. All building materials were ordered from local building supply companies for each job and were sent to the job site. Petitioner subcontracted all construction work and did not employ construction crews directly. Petitioner followed the above-described procedure for constructing houses until June 1964. Thereafter, he no longer constructed *125 houses in an individual capacity, but contracted with a corporation known as Hallmark Homes, Inc., at a fixed price for actual construction work. The capital stock of Hallmark Homes, Inc., was owned equally by petitioner's two children who were both about 20 years of age. Petitioner, doing business as S.S. Steele & Co., continued to sell houses throughout 1964. Purchasers of petitioner's houses provided lots free and clear of liens. The lots were located in Mobile and Baldwyn Counties, Alabama, on secondary roads of various surfaces faces ranging from dirt to pavement. Lots averaged about $900 to $1,000 in value ranging from about $650 to $1,250. Deep wells and septic tanks provided by the purchasers normally cost from about $200 to $275 and from about $125 to $225, respectively, although some lots already had deep wells and septic tanks installed at the time the purchasers contracted for their houses. It was possible for the cost of a deep well to vary considerably from the norm because of the relative depth necessary to obtain water. Typically, petitioner's customers were blue collar workers living in rural areas, ranging in age from 21 to 45 and having annual incomes from $4,000 *126 to $5,000. A customer's family normally consisted of himself, his wife and one to three children. Customers usually had little or no cash reserves or property. Petitioner's accountants established and maintained his books so that, from 1960 through June 1964, construction costs of each house were recorded and accumulated in a "Construction in Progress" account by job name. Profits were determined upon the closing of a sale by deducting all of the construction costs from (a) the sum of all cash received, including the down payment if any, and (b) 30 percent of the face value of the second mortgage promissory notes received by petitioner. The balance of the face amount of the second mortgage notes (i.e., 70 percent) was credited to an account entitled "Unearned Discount." A sale was considered closed when the transaction was complete; that is, when construction was completed and accepted, the sale of the house recorded, and cash was received from the purchaser or primary lender or both. That time was when the respective construction in progress account was transferred to the cost of sale account, and was when profits were determined as described above. Income from the sale of houses *127 was reported in the year in which the houses were completed. Expenses other than construction costs were deducted in the year they were paid. Thereafter, as collections on the second mortgages were received, interest payments and 70 percent of principal collections were credited to income. After June 1964 petitioner continued to determine and report profits from the sale of houses in the previously described manner, except that no further charges were made to the construction in progress accounts. The aggregate annual fair market value of the second mortgage notes received by petitioner was not in excess of 30 percent of their face amount for the years in issue. Petitioner held the following amounts of second mortgages as of the end of each year indicated: Year
Amount
1962
$ 63,897.55
1963
154,198.99
1964
217,744.50
At the end of the years indicated, the balances in the "Unearned Discount" account were as follows: Year
Amount
1962
$ 48,122.89
1963
108,648.66
1964
152,420.77
The amount of the second mortgages received by petitioner with respect to houses 887 built by Hallmark Homes, Inc., after June 1964 and held as of *128 December 31, 1964, was $28,967.97. The corresponding amount in the "Unearned Discount" account was $20,277.59. Respondent determined the deficiencies in issue as follows: For 1963 he added to petitioner's income the balance in the "Unearned Discount" account as of January 1, 1963 ($48,122.89), plus the amount added to that account during 1963 and not taken into the determination of income for that year ($60,525.77). For 1964 respondent added to petitioner's income the amount of the increase in "Unearned Discount" occurring in 1964 which reflected in the balance of that account on December 31, 1964, i.e., $43,772.11. Respondent made the adjustments required by section 481(b)(1) of the Internal Revenue Code of 1954 in computing the deficiencies. Ultimate Findings of Facts Inclusion of the fair market value of the second mortgage notes in income was an incorrect application of the completed contract method of accounting which resulted in a failure to clearly reflect petitioner's income. Petitioner should have included the face amount of these notes in his income for 1963 and 1964. Petitioner is not entitled to deduct 70 percent of the second mortgage notes *129 as a reasonable addition to a reserve for bad debts. Opinion During 1963 and until July 1964, petitioner, doing business as S.S. Steele & Co., constructed houses for individuals on a contract basis. He received cash only in some of these transactions, and it was stipulated that they were accounted for and reported on the cash basis. In other transactions he received promissory notes secured by second mortgages, the buyers having paid a portion of the respective sales price in cash or obtained loans secured by first mortgages from lending institutions. He accounted for and reported these transactions on the completed contract basis of accounting whereby expenses were accumulated for each job or contract until the contract was closed. After June 1964 petitioner stopped building houses, but continued to sell houses built by a corporation. He continued to account for and report income and expenses in the same manner except that he eliminated the accounts in which construction expenses were accumulated. The face amount of the second mortgage note represented the gross profit on each contract. The main question to be resolved is whether, under the completed contract method of reporting *130 income, petitioner may report only the fair market value of the second mortgage notes or whether he should be required to include their face value in gross income. Since both parties agree that petitioner properly used the completed contract method of accounting, [1] we must decide whether that method was correctly applied to petitioner's business. The completed contract method of accounting is a modification of the accrual method by which corresponding items of income and expense normally are matched at the time the contract is completed regardless of when items arise. See 2 Mertens, Law of Federal Income Taxation, sec. 12.134. The use of this method generally results in postponement of recognition of items of expense and income for tax purposes because contracts may be performed, as some were here, over more than one annual *131 accounting period. [2] We are concerned, however, with the frequent problem of how to treat petitioner's right to income when such income is not received during the year of actual completion of the contract. The controlling principles and rationale are set out in National Contracting Co., 37 B.T.A. 689, 701-702 (1938), affd. 105 F. 2d 488 (C.A. 8, 1939): Under the completed contracts method of accounting the ordinary rule in the case of items outstanding when a contract is "completed" is that "it is the right to receive and not the actual receipt that determines the inclusion * * *. [n8] Unless this accrual of outstanding *132 items is made in the year of completion, the purpose of the completed contracts method, namely, to account for the entire results of a contract at one time, [n9] is defeated. However, as a general principle, when outstanding items are "contingent and uncertain," 888 such as disputed claims in litigation, accrual crual is not proper. Commissioner v. John Thatcher & Son, 76 Fed. (2d) 900; North American Oil Consolidated v. Burnet, 286 U.S. 417. While no case has apparently purported to determine this question under the long term contracts method, no reason appears why the rule should be less applicable to that type of accrual. And that this procedure may leave the exact profit or loss open for future adjustment is not fatal. W. J. Scholl Co., 30 B.T.A. 993, 997. [Footnotes omitted.]
When petitioner completed the houses and closed out the contracts, he became entitled to the sales price. Nothing remained to be done in order to earn the sales price. His right to that sum was fixed at the closing even though he permitted his customers to defer payment over a period of years. In discussing the principles of accrual accounting in Western Oaks Building Corp., 49 T.C. 365 *133 (1968n8, this Court made the following comments on the situation in which an accrual basis taxpayer receives notes upon the sales of homes which it constructed: Under these general rules, if the petitioners in the present case had taken and held a note of the purchaser, instead of a restricted account, these notes would clearly have been includable in income in the year of sale at face amount. Spring City Co. v. Commissioner, supra; First Savings & Loan Association, supra Petitioner, therefore, should have reported the second mortgage notes at face value. A contrary conclusion would eliminate the distinction between cash and accrual accounting. Thus we must hold in favor of respondent on this issue unless we can find, and we cannot so find, that the notes were contingent and uncertain because, as petitioner contends, collectibility was in doubt. We believe petitioner's evidence that the fair market value of the notes did not exceed 30 percent of their face value. But fair market value and collectibility, although related, are not synonymous concepts. Jones Lumber Co., Inc. v. Commissioner, 404 F. 2d 764 (C.A. 6, 1968), affirming a Memorandum Opinion of this Court. *134 As pointed out in Jones Lumber Co., cases holding an item nonaccruable because of doubtful collectibility are based upon substantial evidence of financial instability or insolvency. If there was a reasonable expectancy of payment, the face amounts of the notes must be accrued at completion. Georgia School-Book Depository, Inc., 1 T.C. 463 (1943); [3]Jones Lumber Co., Inc. v. Commissioner, supra.
*135 Petitioner's evidence was directed at the financial resources of the typical purchaser, the value of the underlying security for the second mortgage notes and the market value of those notes. While 30 percent of face might be the maximum or close to the maximum that petitioner could realize by selling the notes in the open market, certainly no intelligent, profit-oriented buyer would pay that amount if he could not reasonably expect to realize a greater percentage in collections. Even petitioner testified that his collection record was satisfactory. When deciding to accept the notes he relied heavily on the first mortgagee's appraisal of the financial ability of the debtor. There is no other evidence regarding his record of collections and the reasonableness of his expectations. Consequently, on this record the most that can be said in petitioner's favor regarding his expectancy of collections is that he could reasonably expect some unestimated amount of defaults 889 totaling considerably less than 70 percent of the aggregate face amounts. The mere possibility of defaults on some of the notes is not a sound reason for holding that collectibility was sufficiently contingent or *136 uncertain to prevent the accruing of earned income. Western Oaks Building Corp., supra at 372, citing First Savings & Loan Association, supra at 487. Otherwise the exception would swallow the rule. We hold, therefore, that petitioner's failure to include the face amount of these notes in his income was an incorrect application of the completed contract method of accounting which resulted in a distortion of his income. Petitioner relies solely on American Electric Co., Ltd., T.C. Memo. 1966-76. In that case the petitioner, a subcontractor, was paid for its services by the general contractor with the debentures of a third party for whom the general contractor constructed a shopping center. The debenture extinguished the debt of the general contractor. The subcontractor used the completed contract method and included the debenture in income at its fair market value. We upheld this treatment. Since petitioner herein received the promissory notes of his customers in payment for the houses and since the obligations of the purchasers were not extinguished merely by giving a written promise to pay the sales price, we think the American Electric Co. case is factually *137 distinguishable from this case. Moreover, in that case we thought the value of the subcontractor's services was controlled by sections 1.61-2(d)(1) and (4), Income Tax Regs., which deal with compensation for services paid other than in cash. Certainly that case does not compel the result petitioner seeks here in refusing to accrue the sales prices of houses at the time contracts were completed. Alternatively, petitioner contends that his "books of account were kept on the conventional cash method of accounting" after June 1964 because he ceased constructing homes and "began operations as a sales agent for Hallmark Homes, Inc." Petitioner does not claim that he obtained the consent of the Commissioner to change before reporting his income for such period as required by section 1.446-1(e)(2)(i), Income Tax Regs. Elmwood Corp v. United States, 107 F. 2d 111 (C.A. 5, 1939), certiorari denied, 309 U.S. 675 (1940). He appears to rest on the theory that since his method of doing business changed his method of accounting also changed. The facts, however, contradict his theory. Assuming a change in doing business might warrant upholding *138 a change in accounting and reporting income, petitioner has not demonstrated that there was a significant change in conducting his business. Prior to July 1964 he contracted for the construction and sale of homes, and subcontracted all construction work. Thereafter he contracted for the construction and sale of homes on behalf of Hallmark Homes. He has not shown this difference to be significant. In fact, he continued to keep his books and to report income as before except that he eliminated the construction in progress accounts from his bookkeeping system. In our opinion petitioner did not use a different method of accounting during the latter part of 1964, and there is no reason for treating the second mortgage notes any differently than they should be treated prior to July 1964. Petitioner's final contention is that he should be allowed a deduction for a reasonable addition to a reserve for bad debts pursuant to section 166(c).[4] Petitioner's theory [5] is that the "Unearned Discount" account was the equivalent of a bad debt reserve and that such reserve was reasonable. The short answer to this theory is that *139 a bad debt is not deductible, but only the addition to the reserve may be deducted. Sections 1.166-1(a)(2) and 1.166-4(a), Income Tax Regs.; J. Gordon Hill, 11 B.T.A. 910, 912 (1928). Even if we *140 assume arguendo that petitioner's "Unearned Discount" account constituted, or may be treated as, a reserve for bad debts, [6] he has completely failed to show 890 whether that account reasonably reflected his anticipated bad debts. As previously noted, petitioner's expert witnesses testified to factors relating to the fair market value of the notes. But fair market value is a different animal than collectibility or anticipated bad debts. Roanoke Vending Exchange, Inc., 40 T.C. 735, 744 (1963), citing Lenamon v. Commissioner, 296 F. 2d 844 (C.A. 5, 1961), which affirmed a Memorandum Opinion of this Court Petitioner testified that his collection experience was satisfactory, implying that he expected to collect more than 30 percent of the face amount of the notes. Yet he also testified and contends that the notes were worth no more than 30 percent, and he did not relate his actual collection experience. Petitioner's accountant testified that no second mortgage notes were charged off during the years in issue. In our judgment the record affirmatively shows that 70 percent of the face amount of the notes was not a reasonable addition to the presumed bad debt *141 reserve, and therefore we hold that petitioner has failed to carry his burden of proving what percentage constituted a reasonable addition. See Roanoke Vending Exchange, Inc., supra at 741. Decision will be entered for the respondent. Footnotes
1. See sections 446(a), (b) and (c) and 451(a), Internal Revenue Code of 1954; sections 1.446-1 (a), 1.451-1(a) and 1.451-3, Income Tax Regs.↩ All statutory references herein are to the Internal Revenue Code of 1954 unless otherwise indicated.
2. Although petitioner performed all his construction contracts within 12 months, many were not completed in the same period in which they were commenced. It is not contended that these facts render the completed contract method inappropriate. See section 1.451-3(a), Income Tax Regs., and Daley, et al. v. United States, 243 F. 2d 466 (C.A. 9, 1957), certiorari denied 355 U.S. 832↩ (1957).
3. In that case we commented as follows at pp. 468-469: We pass, then, to the second question, whether there was a reasonable expectancy that the claim would ever be paid. Where there is a contingency that may preclude ultimate payment, whether it be that the right itself is in litigation or that the debtor is insolvent, the right need nto be accrued when it arises. This rule is founded on the old principle that equity will not require a suitor to do a needless thing. The taxpayer need not accrue a debt if later experience, available at the time that the question is adjudged, confirms a belief reasonably held at the time the debt was due, that it will never be paid. Corn Exchange Bank v. United States, 37 Fed. (2d) 34 (2d Cir.); H. Liebes & Co. v. Commissioner, 90 Fed. (2d) 932 (9th Cir.), and cases there cited at page 937. On the other hand, it must not be forgotten that the alleviating principle of "reasonable expectancy" is, after all, an exception, and the exception must not be allowed to swallow up the fundamental rule upon which it is engrafted requiring a taxpayer on the accrual basis to accrue his obligations, Spring City Foundry Co. v. Commissioner, supra. If this were so, the taxpayer might at his own will shift the receipt of income from one year to another as should suit his fancy. Cf. Clifton Manufacturing Co., 1 T.C. 71↩. To allow the exception there must be a definite showing that an unresolved and allegedly intervening legal right makes receipt contingent or that the insolvency of his debtor makes it improbable. Postponement of payment without such accompanying doubts is not enough.
4. SEC. 166. BAD DEBTS. * * * (c) Reserve for Bad Debts. - In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts. ↩
5. In his brief petitioner states: The mechanics of the accounting system employed by petitioner create the equivalent of a bad debt reserve; the "Unearned Discount" account to which the portion of the face amount of the second mortgage notes not taken into income is credited corresponds to a reserve account. The reporting of collections of amounts so credited, and the corresponding reduction of the "Unearned Discount" account are entirely consistent with the reserve accounting required by Regulations 1.166-4. The reasonableness of the amount of the reserve is amply supported by the opinion testimony of competent credit experts.↩
6. But see sections 1.166-4(a) and 1.166-1(b), Income Tax Regs. Petitioner has not shown that he sought or obtained the approval of the district director. Nor does it appear that he filed the statement contemplated by section 1.166-4(c), Income Tax Regs.↩