ROBERT C. HARRIS AND FRANCES A. HARRIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Harris v. Commissioner
Docket No. 11400-77.
United States Tax Court
T.C. Memo 1982-410; 1982 Tax Ct. Memo LEXIS 339; 44 T.C.M. (CCH) 523; T.C.M. (RIA) 82410; July 20, 1982. Robert C. Harris and Frances A. Harris, pro sese. Charles W. Kite, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined the following deficiencies in and additions to the petitioners' Federal income tax: Additions to Tax
Year
Deficiency
Sec. 6651(a)(1) [1]
Sec. 6653(a)
1970
$5,245.68
$1,311.42
$262.28
1971
16,847.90
4,211.98
857.17
1972
5,479.50
1,869.88
407.73
*341 It is important at the outset to present the procedural history of this case both before and during the trial. During the years 1970, 1971 and 1972, Mr. Harris (all references to petitioner in the singular will refer to Mr. Harris) was in the business of developing and selling real property and selling mobile homes in the Nashville, Tennessee, area. Mr. Harris believed he conducted this business through a corporation, although respondent maintains that this income is taxable to Mr. Harris personally. The petitioners' Federal income tax returns for the taxable years 1970, 1971 and 1972 were selected for examination and in 1974 Mr. Robert F. Whitley, a revenue agent, was assigned to conduct the examination. The petitioners did not have adequate books and records for the years in question. At considerable expense they employed an accountant to reconstruct their income and expenses, using cancelled checks and other primary documents provided by the petitioner. Mr. Whitley, primarily from documentary stamps on conveyances recorded in Rutherford County, determined that petitioners realized additional *342 income from the sales of real estate lots and mobile homes, using the accrual method of accounting. Mr. Whitley's examination of petitioners' returns was suspended, at some point in time, because of the initiation of a criminal investigation of the petitioners' returns by a specical agent of the Internal Revenue Service. During the criminal investigation the special agent obtained some 40 affidavits of independent third parties who had business dealings with the petitioner during the years in question. Many of these affidavits cover the sales by the petitioner of real estate, frequently together with a mobile home thereon, to the affiant. These affidavits set forth the amount of consideration that the petitioner received on these sales which, for reasons which include default, foreclosure, and the assumption of previous loans on the properties, was generally significantly less consideration than shown on the face of the deeds from which the revenue agent, Mr. Whitley, made his determination of unreported income. The criminal investigation of the petitioners was concluded. A decision not to prosecute the petitioners criminally was apparently made because the control of the *343 examination of petitioners' tax returns was returned to the revenue agent, Mr. Whitley. Mr. Whitley concluded his audit. In preparing his report, Mr. Whitley did not consider the numerous third-party affidavits in the possession of the Internal Revenue Service which would have substantially reduced Mr. Whitley's determination of unreported income. Mr. Whitley's report was dated October 22, 1974. The Commissioner, three years later on October 11, 1977, mailed to petitioners a statutory notice of deficiency setting forth the deficiencies in and additions to the petitioners' Federal income tax for the years in question. This notice of deficiency was based on the report of Agent Whitley. The petitioners filed their petition with this Court on November 14, 1977. The trial of this case was long and arduous. This Court traveled to Nashville on three occasions to complete the trial. Following one continuance which was granted to the parties in order to settle the case, we commenced the trial in September 1979. After three days of trial, during which time the ill-prepared petitioners succeeded only in presenting a confusing morass, we suspended the trial, ordered the parties to *344 get their case in order and directed them to report their progress to a special trial judge who would be in Nashville in December. When the parties reported in December that they were ready to proceed with the trial, we returned to Nashville for two days of trial in February 1980. Throughout the trial, respondent objected to virtually every piece of evidence presented by petitioners, who were appearing pro se. Over 600 exhibits were received into evidence by this Court during the trial. One of respondent's continuing objections, on the grounds of surprise, was that much of the evidence offered by petitioners related to issues that were outside the scope of a pretrial stipulation of the parties as to the issues not settled. During the trial, however, it became obvious to this Court that petitioners were probably entitled to deductions that this procedural nicety was effectively denying them. In view of this, and because respondent's objection was based upon surprise, we reversed our previous evidentiary rulings thereon and held that we would consider all competent evidence but that we would suspend the trial until May in order to afford respondent ample time to prepare for the *345 introduction of this new evidence. We concluded the trial on May 9, 1980. After this trial began, respondent had a second revenue agent examine both the first revenue agent's work papers and the evidence presented at trial. On the basis of this examination the respondent made numerous concessions as to the petitioners' taxable income which, together with some minor post-trial concessions, totaled $8,115.96, $13,945.69 and $23,848.94 for the taxable years 1970, 1971 and 1972, respectively. After presentation of the evidence we closed the record. We set the briefing dates. Petitioner, who represented himself, then reminded us that he had not been given an opportunity to complete his cross-examination of Agent Whitley. We reopened the record for this purpose. This cross-examination revealed what petitioner had attempted to explain throughout the proceeding. Through the testimony of Agent Whitley, it became clear that at the time that he prepared his report and submitted it to his supervisors, long before the period of limitations on assessment would expire, the Internal Revenue Service already had in its possession the affidavits obtained by the special agent from third parties *346 concerning transactions with the petitioners which showed that petitioners had realized far less income from the sales of lots and mobile homes than the revenue agent, Mr. Whitley, had determined. Those affidavits were not examined by Revenue Agent Whitley nor were they considered by him in making his determination in the statutory notice of deficiency which was issued some three years later. There was no pressure to mail the notice of deficiency because of the expiration of the period of limitations on assessment. The frustration of spending several weeks of the Court's time hearing this case and analyzing the evidence is compounded by the realization that the entire proceeding is an exercise in futility. It was apparent to us at trial that the Commissioner will never collect any tax we find to be due. Petitioners have virtually no assets. Mr. Harris, at the time of trial, had no business and was unemployed. Mrs. Harris was working to support both of them. It is a mystery to us why respondent wanted to try this case and pursue it to opinion. [2] The resolution of the issues will provide no legal precedent. But decide it we must. *347 The issues presented for our decision are as follows: (1) To what extent, if at all, must petitioners report as income proceeds from the sales of real estate lots and mobile homes some of which were reported as income by H and H Development Corporation and by T.B.M. Enterprises (T.B.M), their wholly owned corporations, and the remainder of which was reported on their joint return? (2) To what extent, if at all, may petitioners deduct expenses relating to the business of subdividing real estate into lots and sales of such lots and mobile homes which were deducted by them, by H and H and by T.B.M.? (3) To what extent, if any, may petitioners deduct as business bad debts losses from the worthlessness of promissory notes, the face amounts of which were included in income? (4) To what extent, if any, may petitioners deduct as business or nonbusiness bad debts payments to Nashville City Bank in satisfaction of petitioner's personal guarantee of repayment of installment promissory notes factored to that bank? (5) May petitioners deduct the loss sustained in the sale of their personal residence? (6) Are petitioners required to recapture as ordinary income under section 1250 *348 any portion of the gain they realized from the sale of Wellworth Duplexes? (7) To what extent, if any, did petitioners erroneously report the net income they realized from rents? (8) To what extent, if any, did petitioners erroneously report interest income? (9) To what extent, if any, did petitioners erroneously report their income from capital gain? (10) Are petitioners liable for additions to tax under the provisions of sections 6651 and 6653(a). FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and exhibits are incorporated herein by this reference. Petitioners Robert C. and Frances A. Harris filed their Federal joint income tax returns for the taxable years ending December 31, 1970, 1971 and 1972 with the Director, Internal Revenue Service Center, Memphis, Tennessee, on February 27, February 28, and March 19, 1974, respectively. They resided in Nashville, Tennessee, at the time they filed their petition with this Court. T.B.M. Enterprises was formed as a partnership in the 1960's and did business as the House of Color, selling electrical applicances, mainly television sets. It was incorporated in the late sixties, but by *349 late 1969 or early 1970 it was unable to continue business and thereupon ceased. The petitioner was a shareholder of T.B.M. while it was a viable corporation. T.B.M. sold a substantial number of appliances on on installment contracts. It factored these time payment contracts to Nashville City Bank (hereinafter NCB) with full recourse against T.B.M. and against Mr. Harris, individually. Many of the time payment contracts factored to NCB became uncollectible. The petitioner was called upon by NCB to comply with his obligation as guarantor. The petitioner made payments, as guarantor, to NCB of the obligations of the House of Color in 1970, 1971, and 1972 in the amounts of $12,335.07, $12,030.92 and $1,095.27, respectively. The petitioner reported to the State of Tennessee in a sales tax agreement signed March 1, 1971, that T.B.M. was no longer in business. The only transactions in a bank account set up for T.B.M. Enterprises, Inc., during the years in question were one deposit and one withdrawal. During the years 1970, 1971 and 1972, the petitioner was in the business of developing and selling real property in the Nashville, Tennessee, area. [3] The petitioner and another individual *350 organized, in 1970, the H and H Development Corporation, under the laws of the State of Tennessee, through which they intended to develop and sell real property. The association of these two gentlemen soon came to an impasse, however, and the other individual participated only in the earliest stages of this business. Although believing that he was doing business in the form of a corporation, Mr. Harris did not keep adequate corporate books and records. Title to all property was maintained in the name of the petitioner and not in the corporate name. All instruments of sale and related documents were in the name of the petitioner and not in the corporate name. The petitioner did not have an agency contract with the corporation providing that he act as nominee for the corporation concerning these real property transactions. After the Internal Revenue Service began an audit of the petitioners' Federal income tax returns for the years in question, the petitioner secured the services of an accountant who caused the petitioner to sign documents whereby petitioner purportedly purchased notes receivable on various real estate transactions from the corporation. Although this accountant *351 prepared corporate and individual books for the petitioner, these books were not prepared contemporaneously nor close in time to the dates of the transactions therein set forth. The accountant also prepared Federal corporate income tax returns for the two corporations. The corporate income tax returns for the H and H Development Corporation for the taxable years ending May 31, 1971, 1972 and 1973 were filed on October 1, 1971, March 19, 1974, and September 26, 1974, respectively. The corporate income tax returns for T.B.M. Enterprises for the taxable years ending December 31, 1970, 1971, and 1972 were filed on February 27, 1974, February 27, 1974, and March 20, 1974, respectively. The petitioner was president of both corporations. We will set forth the petitioner's income and expenses according to the appropriate taxable year. [4] All items of petitioner's income and expense relate to the petitioner's trade or business of developing and selling real *352 property, which includes the sale of mobile homes associated with this realty, unless otherwise indicated. When the petitioner sold a lot he frequently included in the sale a mobile home which he had purchased and placed on the property. In this event the parties ot the sale agreed that a specified portion of the consideration was for the sale of the lot and that another specified portion of the consideration was for the sale of the mobile home. The Commissioner, in his notice of deficiency, accepted these allocations. The statutory notice of deficiency does not set forth the amount that is determined as the income from each lot but rather provides a total amount from lot sales and a total amount from the sale of mobile homes. The parties stipulated to exhibit 4-D which sets forth the amount of income that respondent originally claimed that the petitioners received *353 regarding each property. The total amounts as shown on this document as the amounts claimed by the respondent are identical to the total amounts in the notice of deficiency.
During the trial the respondent had a second revenue agent review the first revenue agent's work papers and the evidence presented at trial. This revenue agent prepared a recalculation which the respondent used as a basis for many of its concessions. This recalculation grossed the amount of the mobile home sales into the lot sales. We have maintained the allocations between the amounts of consideration for mobile homes and for lot sales both because the parties made such an allocation and because the Commissioner accepted these allocations in the notice of deficiency. The different methods should not produce a difference in the final result as they do not affect the total amounts or timing of any transaction. Taxable Year 1970
The petitioner sold lot No. 42 to Robert C. and Rasine A. Young by deed filed April 18, 1972, for a stated consideration of $3,700. The petitioner received from the sale of lot No. 42 a cash down payment in the amount of $500, additional consideration in the form of a note *354 in the amount of $2,780.40 which he discounted to the Nashville City Bank and received cash proceeds of $2,139, and additional consideration in the form of a second note in the amount of $2,224.32 executed by the Youngs, which had a present value at the date of closing of $1,297.96. The petitioners' total income in 1970 from the sale of lot No. 42 to the Youngs was $3,936.96. The petitioner sold lot No. 1 in Battlefield Meadows to James and Susie M. Buchanan by deed dated June 28, 1970, for a stated consideration of $3,500.The petitioner received from the sale of lot No. 1 a cash down payment in the amount of $1,000, and additional consideration in the form of a note in the amount of $3,468.60 which he discounted to the Nashville City Bank and received cash proceeds of $2,500. The petitioners' total income in 1970 from the sale of lot No. 1 to the Buchanans was $3,500. Petitioner sold lot No. 47 to Roger F. and Barbar L. Banton pursuant to a contract dated July 23, 1970, for a stated consideration of $10,812. The petitioner received from the sale of lot No. 47 cash from the trade-in value of other property in the amount of $1,000, additional consideration in the form of a *355 note in the amount of $2,400 which he discounted to the Nashville City Bank and received cash proceeds of $1,830, additional consideration in the form of a second note in the amount of $2,400 executed by the Bantons, which had a present value at the date of closing of $1,000, and additional consideration in the form of a third note in the amount of $2,880 executed by the Bantons, which had a present value at the date of closing of $880. The petitioner subsequently returned to the Bantons a total of $764.58 as additional credit on the trade-in of other property. The petitioner also subsequently returned to the Bantons $330 as credit for the washer and dryer that were supposed to have been, but were not, in the mobile home on the property when sold. These subsequent adjustments took place in 1970. The petitioners' total income in 1970 from the sale of lot No. 47 to the Bantons was $3,615.42. The petitioner sold lot No. 48 to Leon and Nettie H. Carver by deed dated August 28, 1970, for a stated consideration of $3,000. The petitioner received from the sale of lot No. 48 cash in the amount of $3,000. The petitioners' total income in 1970 from the sale of lot No. 48 to the Carvers *356 was $3,000. The petitioner sold lot No. 6 to Carl F. and Rose S. Montgomery by deed dated August 29, 1970, for a stated consideration of $3,150. The petitioner received from the sale of lot No. 6 cash at the closing in the amount of $3,100. The petitioners' total income in 1970 from the sale of lot No. 6 to the Montgomerys was $3,100. The petitioner sold lot No. 45 to David Woods by deed dated September 29, 1970, for a stated consideration of $3,190.The petitioner received from the sale of lot No. 45 a cash down payment in the amount of $500 and additional consideration in the amount of $3,570 which he discounted to the Nashville City Bank and received cash proceeds of $2,730. Petitioners' total income in 1970 from the sale of lot No. 45 to Mr. Woods was $3,230. The petitioner sold lot No. 46 to Carlos and Martha Woods by deed dated September 29, 1970, for a stated consideration of $3,000. The petitioner received from the sale of lot No. 46 a cash down payment in the amount of $300 and additional consideration in the form of a note in the amount of $3,634.20 which he discounted to the Nashville City Bank and received cash proceeds of $2,779.20. The petitioners' total *357 income in 1970 from the sale of lot No. 46 to the Woods was $3,079.20. The petitioner sold lot No. 49 to Troy D. and Jo Ann Brooks by deed dated September 30, 1970, for a stated consideration of $3,000. The petitioner received from the sale of lot No. 49 a cash down payment in the amount of $320, additional consideration in the form of a note in the amount of $2,619 which he discounted to the Nashville City Bank and received cash proceeds of $2,000, and additional considerationin the form of a second note in the amount of $2,095.20 executed by the Brooks, which had a present value at the date of closing of $1,100. The petitioners' total income in 1970 from the sale of lot No. 49 to the Brooks was $3,420. The petitioner sold lot No. 27 to Carl F. and Rose S. Montgomery by deed dated October 14, 1970, for a stated consideration of $3,150. The petitioner received from the sale of lot No. 27 a cash down payment in the amount of $500. The petitioners' total income in 1970 from the sale of lot No. 27 to the Montgomerys was $2,700. The petitioner sold lot No. 24 to Vernon E. and Bette J. Anderson by deed dated November 2, 1970, for a stated consideration of $3,250. The petitioner *358 received from the sale of lot No. 24 a cash down payment in the amount of $68 and addtional consideration in the form of a note in the amount of $4,140 which he discounted to the Nashville City Bank and received cash proceeds of $3,200. The petitioners' total income in 1970 from the sale of lot No. 24 to the Andersons was $3,268. The petitioner sold lot No. 29 to Carl F. and Rose S. Montgomery by deed dated December 9, 1970, for a stated consideration of $2,850. The petitioner received from the sale of lot No. 29 a cash down payment in the amount of $500. The petitioners' total income in 1970 from the sale of lot No. 29 to the Montgomerys was $2,850. The petitioner sold lot No. 50 to Lawrence R. and Linda F. Parham by deed dated December 2, 1970, for a stated consideration of $3,150. The petitioner received from the sale of lot No. 50 a cash down payment in the amount of $315 and additional consideration in the form of a note in the amount of $3,615 which he discounted to the Nashville City Bank and received cash proceeds of $2,781. The petitioners' total income in 1970 from the sale of lot No. 50 to the Parhams was $3,096. The petitioner sold lot No. 57 to Wilber R. and *359 Jane A. Jones by deed dated November 13, 1970, for a stated consideration of $3,250. The petitioner received from the sale of lot No. 57 a cash down payment in the amount of $300 and cash at the closing in the amount of $2,800. The petitioners' total income in 1970 from the sale of lot No. 57 to the Joneses was $3,100. The petitioner sold lot No. 55 to Ray E. and Frances S. Catron by deed dated December 15, 1970, for a stated consideration of $3,250. The petitioner received from the sale of lot No. 55 a cash down payment in the amount of $325 and additional consideration in the form of a note in the amount of $3,954.60 which he discounted to the Nashville City Bank and received cash proceeds of $3,050. The petitioners' total income in 1970 from the sale of lot No. 55 to the Catrons was $3,375.
The petitioner sold lot No. 56 to Eugene and Olivebelle Divine by deed dated December 16, 1970, for a stated consideration of $3,250. The petitioner received from the sale of lot No. 56 a cash down payment in the amount of $325 and additional consideration in the form of a note in the amount of $3,954.60 which he discounted to the Nashville City Bank and received cash proceeds of $3,050. *360 The petitioners' total income in 1970 from the sale of lot No. 56 to the Divines was $3,375. The Notice of deficiency determined that the petitioner's cost of goods sold relating to the sale of mobile homes in 1970 was $5,410.86. The correct amount is $5,510.86. The difference of $100 arises from furniture used to furnish a mobile home which was paid out of petitioners' personal checking account and not the checking account they used for the real estate activities. The following schedule shows the petitioner's expenses related to his real estate and mobile home activities in 1970: Claimed on
Allowed in
Expenses
Return [1]
Statutory Notice
Rent on business property
$ 80.00
Repairs & maintenance
127.71
Insurance
288.65
162.15
Interest on business indebtedness
2,854.60
2,813.36
Bad debts
1,138.40
Selling expense
5,616.00
931.56
Freight out
65.00
Bank service charge
10.00
22.27
Miscellaneous expenses
58.19
437.94
Advertising
3,068.56
1,490.45
Telephone expense
638.13
565.85
Utilities
195.50
62.48
Office supplies
23.42
Dues and Subscriptions
30.00
Damage from breach of contract
2,000.00
Depreciation
580.25
331.58
Automobile expense
1,080.00
Taxes and licenses
209.52
137.60
Commissions paid
6,121.00
734.75
Legal and audit
25.00
Supplies
15.76
Guaranty fee
4,594.53
Closing costs
TOTALS
$27,740.22
$8,769.99
*361 Additional Amounts
Conceded by
Redetermined
Expenses
Respondent
by Court
Rent on business property
Repairs & maintenance
Insurance
162.15
Interest on business indebtedness
55.00
3,314.23
Bad debts
Selling expense
931.56
Freight out
Bank service charge
22.27
Miscellaneous expenses
5,467.69
5,905.63
Advertising
1,490.45
Telephone expense
565.85
Utilities
62.48
Office supplies
Dues and Subscriptions
Damage from breach of contract
2,000.00
2,000.00
Depreciation
331.58
Automobile expense
1,080.00
Taxes and licenses
226.28
Commissions paid
734.75
Legal and audit
Supplies
Guaranty fee
Closing costs
353.23
353.23
TOTALS
$7,875.92
$17,180.46
Additional
Reported on
Determined in
Concessions
Redetermined
Return
Statutory Notice
by Respondent
by Court
Rental income
$ (338.93)
$79.40
$ ( 59.87)
$19.53
Interest income
55.39 Capital gain: Land
1,463.61 Stock
1,500.00 Tract 5
1,800.00 1,800.00
(550.00)
1,250.00
*362 In addition to the above, the respondent has conceded that the guarantor payments which petitioner made in 1970 as guarantor of the House of Color bad debts were in excess of $1,900. The respondent apparently has chosen this method of expressing his concession in view of the limitation of capital loss deductions. As mentioned above, we have redetermined that the petitioner made guarantor payments in the year 1970 in the amount of $12,335.07. Taxable Year 1971
The petitioner sold lot No. 3 to Thomas E. Davis by deed dated January 20, 1971, for a stated consideration of $3,650. The petitioner received from the sale of lot No. 3 a cash down payment in the amount of $100, and additional consideration in the form of a note in the amount of $4,522.50 which he discounted to the Nashville City Bank and received cash proceeds of $3,350. The petitioner paid a commission of $365 to a third party with respect to this sale which the Commissioner did not give petitioner credit for in the notice of deficiency. The petitioners' total income in 1971 from the sale of lot No. 3 to Mr. Davis was $3,085. The petitioner sold lot No. 53 to Billie and Betty Doak Bryant by deed dated January 20, 1971, for *363 a stated consideration of $3,250. The petitioners' total income in 1971 from the sale of lot No. 53 to the Bryants was $2,888.50. The petitioner sold lot No. 5 to Jerry B. King by deed dated April 6, 1971, for a stated consideration of $10,900. The petitioner received from the sale of lot No. 5 a cash down payment in the amount of $700, cash at the closing in the amount of $6,885, additional consideration in the form of a note in the amount of $2,670 which he discounted to the Nashville City Bank and received cash proceeds of $2,000, and additional consideration in the form of a second note in the amount of $2,670 executed by Mr. King, which had a present value at the date of closing of $986.32. The petitioner included in the sale a mobile home located thereon. The amount of this consideration received allocable to the sale of the land was $3,321.32 and the amount of this consideration received allocable to the sale of the mobile home is $7,250. The respondent concedes that the petitioner had closing expenses related to this transaction in the amount of $461.50 and represents that the closing expenses related to this transaction which were allowed in the notice of deficiency *364 amounted to $108.37, so that the additional amount conceded by the respondent is $353.23. The petitioners' total income in 1971 from the sale of lot No. 5 to Mr. King was $2,968.09. The petitioner sold lot No. 30 to Alton W. and Jacquelynn Gueuling by deed dated April 6, 1971, for a stated consideration of $9,400. The petitioner received from the sale of lot No. 30 a cash down payment in the amount of $950, cash at the closing in the amount of $6,181.05, additional consideration in the form of a note in the amount of $2,052.60 which he discounted to the Nashville City Bank and received cash proceeds of $1,500, and additional consideration in the form of a second note in the amount of $1,478.40 executed by the Gueulings, which had a present value at the date of closing of $546.13. The petitioner included in this sale a mobile home located thereon. The amount of this consideration received allocable to the sale of the land is $2,527.18 and the amount of this consideration received allocable to the sale of the mobile home is $6,700. The petitioners' total income in 1971 from the sale of lot No. 30 to the Gueulings was $2,527.18. The petitioner sold lot No. 31 to Jerry Edward *365 and Elizabeth Steffno by deed dated May 6, 1971, for a stated consideration of $12,945. The petitioner received from the sale of lot No. 31 a cash down payment in the amount of $945, cash at closing in the amount of $8,320.41, additional consideration in the form of a note in the amount of $2,563.80 which he discounted to the Nashville City Bank and received cash proceeds of $2,000, and additional consideration in the form of a second note in the amount of $2,563.80 executed by the purchasers, which had a present value at he date of closing of $1,600. the petitioner included in this sale a mobile home located thereon. The amount of this consideration received allocable to the sale of the land is $3,070.41 and the amount of this consideration received allocable to the sale of the mobile home is $9,795. The petitioners' total income in 1971 from the sale of lot No. 31 was $3,070.41 Petitioner sold lot No. 4 to Clytus A. and Peachie J. Smith by deed dated July 2, 1971, for a stated consideration of $3,650. The petitioner received from the sale of lot No. 4 a cash down payment in the amount of $100, additional consideration in the form of a note in the amount of $3,054 which he *366 discounted to the Nashville City Bank and received cash proceeds of $2,350, and additional consideration in the form of a second note in the amount of $1,832.40 executed by the Smiths, which had a present value at the date of closing of $1,135.22. The petitioners' total income in 1971 from the sale of lot No. 4 to the Smiths was $3,585.22. The petitioner sold lot No. 33 to Carl Futrell by deed dated July 2, 1971, for a stated consideration of $10,900. The petitioner received from the sale of lot No. 33 a cash down payment in the amount of $100, cash at the closing in the amount of $7,930.16, additional consideration in the form of a note in the amount of $1,080 which he discounted to the Nashville City Bank and received cash proceeds of $900, and additional consideration in the form of a second note in the amount of $6,000 executed by Mr. Futrell, which had a present value at the date of closing of $2,216.44. Petitioner made a payment of $427.48 on behalf of Mr. Futrell in connection with this sale. The petitioner included in this sale a mobile home located thereon. The amount of this consideration received allocable to the sale of the land is $3,069.12 and the amount of this *367 consideration received allocable to the sale of the mobile home is $7,650. The petitioners' total income in 1971 from the sale of lot No. 33 to Mr. Futrell was $3,069.12. The petitioner sold lot No. 43 to Merlie C. and Eula Sams by deed dated July 2, 1971, for a stated consideration of $13,250. The petitioner received from the sale of lot No. 43 a cash down payment in the amount of $3,000, cash at the closing in the amount of $8,169.50, and additional consideration in the form of a note in the amount of $1,500. The Sams also assumed the liability of the petitioner on a note in the amount of $500. The petitioner included in this sale a mobile home located thereon. The amount of this consideration received allocable to the sale of the land is $2,919.50 and the amount of this consideration received allocable to the sale of the mobile home is $10,250. The petitioners' total income in 1971 from the sale of lot No. 43 to the Same was $2,919.50. The petitioner sold lot No. 44 to William Thomas and Charity Huffines by deed dated July 2, 1971, for a stated consideration of $10,400. The petitioner received from the sale of lot No. 44 a cash down payment in the amount of $100, cash *368 at the closing in the amount of $7,004.90, and additional consideration in the form of a note in the amount of $8,232 executed by the purchasers, which had a present value at the date of closing of $2,041.80.The petitioner included in this sale a mobile home located thereon. The amount of this consideration received allocable to the sale of the land is $2,401.70 and the amount of this consideration received allocable to the sale of the mobile home is $6,745. The petitioners' total income in 1971 from the sale of lot No. 44 was $2,401.70. The petitioner sold lot No. 52 to Alexander Graham Bell by deed dated July 2, 1971, for a stated consideration of $3,450. The petitioner received from the sale of lot No. 52 a cash down payment in the amount of $150, additional consideration in the form of a note in the amount of $3,341 which he discounted to the Nashville City Bank and received cash proceeds of $2,570, and additional consideration in the form of a second note in the amount of $1,340.40 executed by Mr. Bell, which had a present value at the date of closing of $881.63. The petitioners' total income in 1971 from the sale of lot No. 52 to Mr. Bell was $3,601.63. The petitioner *369 sold lot No. 34 to William C. and Claudine Love by deed dated July 8, 1971, for a stated consideration of $10,900. The petitioner received from the sale of lot No. 34 a cash down payment in the amount of $99, cash at the closing in the amount of $7,065.84, and a promissory note in the principal amount of $2,500. The petitioner included in this sale a mobile home located thereon.The amount of this consideration received allocable to the sale of the land is $2,919.84 and the amount of this consideration received allocable to the sale of the mobile home is $6,745. The petitioners' total income in 1971 from the sale of lot No. 34 to the Loves was $2,919.84. The petitioner sold lot No. 51 to Herman and Edna Minnick by deed dated July 8, 1971, for a stated consideration of $9,950. The petitioner received from the sale of lot No. 51 a cash down payment in the amount of $200, cash at the closing in the amount of $7,394.48, additional consideration in the form of a note in the amount of $1,131.84 executed by the Minnicks, which had a present value at the date of closing of $945.82, and additional consideration in the form of a second note in the amount of $7,179.12 executed by the Minnicks, *370 which had a present value at the date of closing of $1,611.86. The petitioner included in this sale a mobile home located thereon.The amount of this consideration received allocable to the sale of the land is $2,452.16 and the amount of this consideration received allocable to the sale of the mobile home is $7,700. The petitioners' total income in 1971 from the sale of lot No. 51 to the Minnicks was $2,452.16. Petitioner sold lot No. 32 to James T. and Judy G. Douglas by deed dated July 20, 1971, for a stated consideration of $9,950. The petitioner received from the sale of lot No. 32 a cash down payment in the amount of $100, cash at the closing in the amount of $6,809.66, additional consideration in the form of a note in the amount of $8,400 executed by the Douglases, which had a present value at the date of closing of $1,885.98.Petitioner returned $200 to the Douglases for the purchase of drapes. On January 8, 1972, the petitioner made a payment in the amount of $98.58 on behalf of the Douglases with regard to this property. Petitioner included in this sale a mobile home located thereon. the amount of this consideration received allocable to the sale of the land is $1,797.06 *371 and the amount of this consideration received allocable to the sale of the mobile home is $6,700. The petitioners' total income in 1971 from the sale of lot No. 32 to the Douglases was $1,895.64. The payment made by the petitioner in 1972 on behalf of the Douglases is deductible in computing the petitioners' 1972 income. Petitioner sold lot No. 36 to Edward and Katherine Norwood by deed dated August 11, 1971, for a stated consideration of $10,650. The petitioner received from the sale of lot No. 36 a cash down payment in the amount of $99, cash at the closing in the amount of $7,870.25, additional consideration in the form of a note in the amount of $865.44 which he discounted to the Nashville City Bank and received cash proceeds of $733, and additional consideration in the form of a second note in the amount of $5,760 executed by the Norwoods, which had a present value at the date of closing of $1,293.24. Petitioner included in this sale a mobile home located thereon. The amount of this consideration received allocable to the sale of the land is $2,595.49 and the amount of this consideration received allocable to the sale of the mobile home is $7,400. The petitioners' total *372 income in 1971 from the sale of lot No. 36 to the Norwoods was $2,595.49. Petitioner sold lot No. 26 to Houston Joe Smotherman by deed dated September 2, 1971, for a stated consideration of $13,500. Petitioner received from the sale of lot No. 26 cash at closing in the amount of $8,403.54, additional consideration in the form of a note in the amount of $3,120 which he discounted to the Vashville City Bank and received cash proceeds of $2,635.37, and additional consideration in the form of a second note in the amount of $6,860.88 executed by Mr. Smotherman, which had a present value at the date of closing of $2,313.08. Petitioner included in this sale a mobile home located thereon. The amount of this consideration received allocable to the sale of the land is $3,101.99 and the amount of this consideration received allocable to the sale of the mobile home is $10,250. The petitioners' total income in 1971 from the sale of lot No. 26 to Mr. Smotherman was 3,101.99. Petitioner sold lot No. 2 to Burl J. and Doris Hughes by deed dated September 8, 1971, for a stated consideration of $3,900. The petitioner received from the sale of lot No. 2 a cash down payment in the amount of *373 $150, additional consideration in the form of a note in the amount of $3,013 which he discounted to the Nashville City Bank and received cash proceeds of $2,318, and additional consideration in the form of a second note in the amount of $3,013 executed by the Hughes, which had a present value at the date of closing of $1,656.04. The petitioners' total income in 1971 from the sale of lot No. 2 to the Hughes was $4,124.04. The petitioner sold lot No. 38 to Robert Ricky and Teresa Douglas by deed dated September 8, 1971, for a stated consideration of $3,200. The petitioner received from the sale of lot No. 38 a cash down payment in the amount of $100, additional consideration in the form of a note in the amount of $3,198 which he discounted to the Nashville City Bank and received cash proceeds of $2,460, and additional consideration in the form of a second note in the amount of $1,279.20 executed by the Douglases, which had a present value at the date of closing of $841.37. The petitioners' total income in 1971 from the sale of lot No. 38 to the Douglases was $3,401.37. The petitioner sold lot No. 39 to Damon and Irene Sams by deed dated September 8, 1971, for a stated consideration *374 of $3,200. The petitioner received from the sale of lot No. 39 a cash down payment in the amount of $300, and additional consideration in the form of a note in the amount of $3,834.60 which he discounted to the Nashville City Bank and received cash proceeds of $2,950. The petitioners' total income in 1971 from the sale of lot No. 39 to the Sams was $3,250. The petitioner sold lot No. 41 to Johnny and Glenda McPeak by deed dated September 8, 1971, for a stated consideration of $3,250. The petitioner received from the sale of lot No. 41 a cash down payment in the amount of $250, additional consideration in the form of a note in the amount of $3,399.60 which he discounted to the Nashville City Bank and received cash proceeds of $2,615, and additional consideration in the form of a second note in the amount of $679.92 executed by the McPeaks, which had a present value at the date of closing of $474.79. The petitioners' total income in 1971 from the sale of lot No. 41 to the McPeaks was $3,339.79. Petitioner sold lot No. 35 to Gabriel J. and Vida E. Grandmaisons by deed dated September 13, 1971, for a stated consideration of $3,250. The petitioner received from the sale of lot *375 No. 35 a cash down payment in the amount of $50, and additional consideration in the form of a note in the amount of $4,137 which he discounted to the Nashville City Bank and received cash proceeds of $3,183. The petitioners' total income in 1971 from the sale of lot No. 35 to the Grandmaisons was $3,233. Although petitioner sold lot No. 1 in 1970, the purchaser defaulted on the mortgage and petitioner repossessed the property. The petitioner then sold lot No. 1 to Jerry B. King by deed dated December 7, 1971, for a stated consideration of $13,500. The petitioner received from the sale of lot No. 1 cash at the closing in the amount of $8,741.05, additional consideration in the form of a note in the amount of $2,136 which he discounted to the Nashville City Bank and received cash proceeds of $1,644, and additional consideration in the form of a second note executed by Mr. King, which had a present value at the date of closing of $1,218.46. Petitioner included in this sale a mobile home located thereon. The amount of this consideration received allocable to the sale of the land is $1,353.51 and the amount of the consideration received allocable to the sale of the mobile home *376 is $10,250. The petitioner had a basis in this property from the previous sale in the amount of $1,517.23. The petitioners sustained a loss in 1971 from the sale of lot No. 1 to Mr. King in the amount of $163.72. Mr. Bell, who purchased lot No. 52 on July 2, 1971, defaulted on his mortgage and petitioner repossessed lot No. 52. Petitioner then sold lot No. 52 to Gary and Dorothy Baxter by deed dated December 24, 1971, for a stated consideration of $3,650. The petitioner received from the sale of lot No. 52 a cash down payment in the amount of $200. The Baxters assumed the two Bell notes which were outstanding on lot No. 52. The petitioners' total income in 1971 from the sale of lot No. 52 to the Baxters was $200. Petitioner sold lot No. 37 to Howard and Velma Freeman by deed dated December 29, 1971, for a stated consideration of $11,000. The petitioner received from the sale of lot No. 37 a cash down payment in the amount of $100, cash at closing in the amount of $7,309.83, and additional consideration in the form of a note in the amount of $7,416 executed by the Freemans, which had a present value at the date of closing of $2,242.57. Petitioner included in this sale *377 a mobile home located thereon. The amount of this consideration received allocable to the sale of the land is $2,952.40 and the amount of this consideration received allocable to the sale of the mobile home is $6,700. Petitioners' total income in 1971 from the sale of lot No. 37 to the Freemans was $2,952.40. The notice of deficiency determined that the petitioners' gross receipts relating to the sale of mobile homes in 1971 was $103,885. The correct amount is $99,095.29. The difference is due to a business bad debt attributable to the mobile home sold to the Norwoods.
The following schedule shows the petitioner's expenses related to his real estate and mobile home activities in 1971: Claimed on
Allowed in
Expenses
Return [1]
Statutory Notice
Taxes and Licenses
$ 316.37
$ 246.77
Insurance
341.85
356.85
Legal and professional fees
2,150.94
1,393.75
Selling expense
3,793.98
4,645.04
Office supplies
400.48
381.39
Advertising
1,058.06
2,358.00
Dues and subscriptions
30.00
30.00
Miscellaneous expense
129.83
69.35
Telephone
1,109.36
941.78
Travel and entertainment
467.35
Bank service charge
12.00
12.00
Depreciation
895.67
663.15
Interest on business indebtedness
5,960.12
4,399.92
Automobile expense
1,080.00
Commissions paid
6,495.00
200.00
Utilities
182.14
90.06
Repairs & maintenance
206.00
136.00
Salaries paid
2,435.00
2,300.00
Bad debts
17,881.53
Guarantor fee
3,622.26
Sales tax
TOTALS
$47,487.94
$19,304.06
*378 Additional Amounts
Conceded by
Redetermined
Respondent
by Court
Taxes and Licenses
$ 1,380.49
Insurance
1,003.15 1,570.00
Legal and professional fees
(692.11)
2,393.75
Selling expense
4,645.04
Office supplies
440.46
Advertising
2,358.00
Dues and subscriptions
(5.00)
30.00
Miscellaneous expense
792.89 862.24
Telephone
941.78
Travel and entertainment
Bank service charge
12.00
Depreciation
663.15
Interest on business indebtedness
(4,324.92)
4,399.92
Automobile expense
1,080.00
Commissions paid
200.00
Utilities
90.06
Repairs & maintenance
136.00
Salaries paid
2,300.00
Bad debts
Guarantor fee
Sales tax
687.00 687.00
TOTALS
$ (2,538.99)
$24,189.89
The following schedule shows the petitioner's items of income that were not related to petitioner's real estate activities and *379 which are at issue: Additional
Reported on
Determined in
Concessions
Redetermined
Return
Statutory Notice
by Respondent
by Court
Rental income
$ (708.03)
$ (147.21)
$ (147.21)
Interest income
304.47 The addition to the above, the respondent has conceded that the guarantor payments which petitioner made in 1971 as guarantor of the House of Color bad debts were in excess of $1,000. The respondent apparently has chosen this method of expressing his concessions in view of the limitation on capital loss deductions. As mentioned above, we have redetermined that the petitioner made guarantor payments in the year 1971 in the amount of $12,030.92. Taxable Year 1972
Petitioner sold lot No. 25 to Walter and Ruth Sanford by deed dated January 4, 1972, for a stated consideration of $13,500. The petitioner received from the sale of lot No. 25 a cash down payment in the amount of $100, cash at the closing in the amount of $9,222.17, and additional consideration in the form of a note in the amount of $4,614.60 which he discounted to the Nashville City Bank and received cash proceeds of $3,550. The petitioner included in this *380 sale a mobile home located thereon. The amount of this consideration received allocable to the sale of the land is $2,208.17 and the amount of this consideration received allocable to the sale of the mobile home was $10,664. The petitioners' total income in 1972 from the sale of lot No. 25 to the Sanfords was $2,208.17. Petitioner sold lot No. 54 to Bruce and Deborah Van Lenten by deed dated February 3, 1972, for a stated consideration of $9,500. The petitioner received from the sale of lot No. 54 cash at the closing in the amount of $6,297.25, and additional consideration in the form of a note in the amount of $8,400 executed by the Van Lentens, which had a present value at the date of closing of $2,540.13. The petitioner had closing costs in the amount of $18.25 which were not allowed in the statutory notice of deficiency. Petitioner included in this sale a mobile home located thereon. The amount of this consideration received allocable to the sale of the land is $2,669.13 and the amount of this consideration received allocable to the sale of the mobile home is $6,650. The petitioners' total income in 1972 from the sale of lot No. 54 to the Van Lentens was $2,669.13. *381 Petitioner sold lot No. 28 to Carl and Rose Montgomery by deed dated February 14, 1972, for a stated consideration of $5,200. The petitioner received from the sale of lot No. 28 consideration in the form of a note in the amount of $5,200 which had a present value at the date of closing of $4,930.67. The petitioner had a cost of goods sold with respect to this sale in the amount of $4,836.66 for which he was not given credit in the statutory notice of deficiency. The petitioners' total income in 1972 from the sale of lot No. 28 to the Montgomerys was $94.01. The petitioner sold lot No. 47 to he Bantons in 1970. The petitioner foreclosed on this property in 1972. Petitioner then sold lot No. 47 to Carl and Rose Montgomery by deed dated April 18, 1972, for a stated consideration of $5,080. The petitioner received from the sale of lot No. 47 additional consideration in the form of a note which he discounted to the Nashville City Bank and received cash proceeds of $3,100. Petitioner had a basis in this property in the amount of $3,569.84, of which $3,425.34 came from notes previously taken into income on an earlier sale, and $144.50 was the result of payment of principal on the *382 previous sale. Petitioners sustained a loss in 1972 from the sale of lot No. 47 to the Montgomerys in the amount of $469.84. The petitioner sold lot No. 58 to Carl and Rose Montgomery by deed dated April 18, 1972, for a stated consideration of $3,500. The petitioner has a basis in lot No. 58 in the amount of $2,528.68, of which $1,628.68 was for principal payments on a mortgage and $900 was the cash down payment they made at purchase. Petitioner received consideration of $3,500 on the sale of lot No. 58. Petitioners' total income in 1972 from the sale of lot No. 58 to the Montgomerys was $971.32. [5]
The petitioner sold lots No. 12, 13, 15, 16 and 17 to the Stewarts Ferry Development Company by deed dated June 21, 1972, for a stated consideration *383 of $12,500.The petitioner received from the sale of lots No. 12, 13, 15, 16 and 17 a promissory note in the principal amount of $12,500. The petitioners' total income in 1972 from the sale of lots No. 12, 13, 15, 16 and 17 to the Stewarts Ferry Development Company was $12,500. Petitioner, by deed dated July 28, 1972, repurchased lot No. 26 which had been sold in 1971. Prior to this repurchase petitioner made payments on behalf of the purchaser of lot No. 26, Mr. Smotherman, in the amount of $862.74. The petitioner then sold lot No. 26 to James and Linda Simkins by deed dated August 16, 1972, for a stated consideration of $11,000. The petitioner received from the sale of lot No. 26 a cash down payment in the amount of $1,000, additional consideration in the form of the assumption of a note in the amount of $8,750 originally executed by Mr. Smotherman, and additional consideration in the form of a second note in the amount of $4,885.65 executed by the Simkins, which had a present value at the date of closing of $2,243.97. The petitioner was previously taxable, in 1971, on the consideration which he received with respect to the $8,750 note. The petitioners' total income in 1972 *384 from the sale of lot No. 26 to the Simkins was $2,381.23. The petitioner sold lot No. 43 to the Sams in 1971.Mr. Sams died in 1972 and the petitioner repurchased lot No. 43 from Eula Sams by deed dated April 7, 1972, for $8,750, with associated costs of $27. The petitioners had additional basis in this property in the amount of $1,500 by reason of the forgiveness of a note in the amount of $1,500 due from the Sams. The petitioner then sold lot No. 43 to Bobby and Linda Jones by deed dated August 25, 1972, for a stated consideration of $11,000. The petitioner received from the sale of lot No. 43 a cash down payment in the amount of $300, additional consideration in the form of a note in the amount of $2,339, and the assumption of an earlier mortgage in the amount of $8,361.89. The petitioners' total income in 1972 from the sale of lot No. 43 to the Joneses was $723.89. The petitioner sold lot No. 52 in 1971 first to Mr. Bell and then to Mr. Baxter. On February 2, 1972, the petitioner repurchased lot No. 52 from Mr. Bell for $2,500. Petitioner made principal payments on an outstanding mortgage on this property in the amount of $696.84. Petitioner then sold lot No. 52 to *385 Carl and Rose Montgomery by deed dated September 1, 1972, for a stated consideration of $2,875. The petitioner received from the sale of lot No. 52 consideration in the amount of $2,875. The petitioners' sustained a loss in 1972 from the sale of lot No. 52 to the Montgomerys in the amount of $321.84. The petitioner sold lot No. 1 in Harris Estates to Thomas and Glenna Bragg by deed dated November 16, 1972, for a stated consideration of $28,500. The petitioners incurred a capital expense in 1970 with respect to this lot in the amount of $300 for a "tap fee." The petitioners' total income in 1972 from the sale of lot No. 1 in Harris Estates to the Braggs was $28,200. The petitioner sold lot No. 40 to James and Linda Poteete by deed dated December 1, 1972, for a stated consideration of $3,500. The petitioners' total income in 1972 from the sale of lot No. 40 to the Poteetes was $2,892.86. The statutory notice of deficiency determined that the petitioner sold lot No. 42 in 1972 for $3,700. This is an error as the respondent conceded at trial. It is duplicative of the 1970 sale of this property. Respondent, in his brief, asserts that the petitioners sold lot No. 36 in *386 1972. This is an error and is duplicative of the petitioner's sale of lot No. 26 in 1972. The notice of deficiency determined that the petitioner's gross sales relating to the sale of mobile homes in 1972 was $17,314. We find that the correct amount is $15,014. The difference is due to a mobile home trade-in on lot No. 25. The following schedule shows the petitioner's expenses related to his real estate and mobile home activities in 1972: Claimed on
Allowed in
Return [1]
Statutory Notice
Taxes and licenses
$ 74.35
$ 9.30
Insurance
110.00
483.00
Legal fees
715.25
1,467.63
Selling expense
910.10
Office supplies
33.90
Advertising expense
160.27
Miscellaneous expenses
845.25
2,188.42
Telephone expense
167.39
Bank charges
16.05
Depreciation
663.15
Interest on business indebtedness
6,628.30
Automobile expense
1,080.00
Commission expense
1,425.00
Utilities
98.96
Repairs & maintenance
232.70
Sales tax
Bad debts
TOTALS
$1,744.85
$15,564.17
Additional Amounts
Conceded by
Redetermined
Respondent
by Court
Taxes and licenses
$ 9.30
Insurance
(283.00)
483.00
Legal fees
1,467.63
Selling expense
910.10
Office supplies
33.90
Advertising expense
160.27
Miscellaneous expenses
2,616.76 4,805.18
Telephone expense
167.39
Bank charges
16.05
Depreciation
663.15
Interest on business indebtedness
9,748.93
Automobile expense
1,080.00
Commission expense
1,425.00
Utilities
98.96
Repairs & maintenance
232.70
Sales tax
124.88 124.88
Bad debts
8,387.76 8,387.76
TOTALS
$10,846.40 $29,814.20
*387 The following schedule shows the petitioners' items of income that were not related to petitioner's real estate activities and which are at issue: Additional
Reported on
Determined in
Concessions
Redetermined
Return
Statutory Notice
by Respondent
by Court
Rental income
$ (1,789.48)
$ (814.97)
$ (814.97)
Interest income
2,882.66 2,986.71 (2,630.30)
356.41 In addition to the above, the respondent has conceded that the guarantor payments which petitioner made in 1972 as guarantor of the House of Color bad debts were in excess of $2,325. The respondent apparently has chosen this method of expressing his concession in view of the limitations on capital loss deductions. As mentioned above, we have redetermined that the petitioner made guarantor payments in the year 1972 in the amount of $1,095.27. Wellworth Duplexes
The Wellworth property was purchased by *388 the petitioners by deed dated March 26, 1971. This property was resold by the petitioners by deed dated March 22, 1972.The petitioners claimed accelerated depreciation on the Wellworth property on their individual Federal income tax returns for the years 1971 and 1972 in the amount of $5,839.05. The Commissioner's notice of deficiency allowed the petitioners depreciation on this property in the amount of $4,511. Subsequent Years
Many of the notes which petitioner received, and which we have included in his income for the years at issue at the present value of such notes, proved in subsequent years to be bad debts. Because these amounts may give rise to a net operating loss carryback which may affect the petitioners' taxable income for the years at issue we find these amounts to be as follows: Lot No.
Amount
Year
1
$2,812.67
1973
2
1,656.04
1973
4
1,135.22
1976
5
986.32
1975
30
546.13
1978
31
1,600.00
1978
41
474.79
1976
42
1,297.96
1976
43
2,339.00
1973
Treatment by the Parties
The petitioners reported their income from the sale of mobile homes on their joint returns for the taxable years 1970, 1971, and 1972 *389 on the accrual basis. The corporate returns of the H and H Development Corporation and T.B.M. Enterprises for the years at issue, which reported the real estate sales together with the sales of mobile homes which were sold together with such realty, reported this income on the accrual basis. In making his determination of the petitioners' individual income for the years 1970, 1971, and 1972, the Commissioner disregarded the corporate entities of H and H Development Corporation and T.B.M Enterprises, Inc., with respect to the sales of the real property and the sales of any houses or mobile homes situated thereon. The Commissioner, in his statutory notice of deficiency, determined that the petitioners understed the amounts of their income from the sale of real estate and mobile homes as well as that they incorrectly reported numerous other items of income and expense, determined that the returns for the taxable years 1970, 1971, and 1972 were not filed within the time prescribed by law, and determined that part of the underpayment of tax for the tax years 1970, 1971 and 1972 is due to negligence or intentional disregard of rules and regulations. OPINION Robert Harris unsuccessfully *390 pursued the business of selling electrical appliances, mainly television sets, through the corporation, T.B.M. Enterprises, under the name of the House of Color. Many of T.B.M.'s appliance sales were made on the installment method. T.B.M. factored these time payment contracts to Nashville City Bank with full recourse both against T.B.M. and against the petitioner, individually. Many of these time payment contracts factored to NCB became uncollectible and the petitioner was called upon to fulfill his obligation as guarantor. The petitioner made payments, as guarantor, to NCB in the amounts of $12,335.07 in 1970, $12,030.92 in 1971, and $1,095.27 in 1972. T.B.M. ceased doing business in 1971. Early in 1970 the petitioner turned his attention to the business of developing and selling real property. Although he initially had a partner with hwich he formed the H and H Development Corporation, through which they intended to pursue the business, the two men soon came to a falling out. The petitioner continued to pursue this new business and did so in his personal capacity, notwithstanding his apparent belief that the existence of this corporation was sufficient to cause the income *391 from this enterprise to be taxable to the corporation and not to him individually. Title to all property was maintained in the name of petitioner and not in the corporate name. All instruments of sale and related documents were in the name of petitioner and not in the corporate name. The petitioner did not have an agency contract with the corporation providing that he act as nominee for the corporation concerning these real property transactions. The petitioner continued his real estate activities throughout 1970, 1971 and 1972. In addition to developing and selling real estate lots he frequently sold a real estate lot together with a mobile home which he had installed on the property. Although beginning fairly well, the petitioner's mobile home activities developed problems. Most significantly, a great number of his purchasers defaulted on their mortgages so that in the long run much of his income from the sale of lots and mobile homes was illustory. The determination of the Commissioner as to a deficiency in tax is presumptively correct. Welch v. Helvering,290 U.S. 111 (1933). The burden of proof is accordingly on the petitioner to show that the Commissioner *392 erred in his determination. This presumption, however, goes only as far as the issues raised and the amounts determined in the notice of deficiency. The burden of proof is on the respondent as to any new matter or increased deficiency. Rule 142, Tax Court Rules of Practice and Procedure.
We must redetermine to what extent, if at all, petitioners must report as income proceeds from the sales of real estate lots and mobile homes which were reported as income by H and H Development Corporation and by T.B.M. Enterprises, their wholly owned corporations, and which were reported on their joint returns. The petitioners maintain that H and H and T.B.M. were duly chartered corporations which the Commissioner had no reason to disregard. The respondent maintains that the petitioners were the owners of the lots and mobile homes sold in the years at issue and that as the owners they are required to report the income received from the sales on their individual income tax returns. The petitioners held record title to the real property and conveyed the lots in all instances in their individual capacity and not as representatives of the corporation. The petitioners provided this Court no *393 competent evidence to the contrary. Further evidence that the petitioners owned the property individually and bought and sold the mobile homes in their individual capacity is the fact that in many instances the petitioner received notes as part of the consideration for the sale.These promissory notes were not payable to any corporation but rather were payable to the petitioner. The petitioner maintains that the lots were owned and sold by H and H and that some of the mobile homes were owned and sold by T.B.M. The evidence, however, indicates that the real estate and mobile home sales and the income therefrom are attributable to the petitioners. The petitioners reported their income from these real estate and mobile home sales on the accrual basis. The petitioners received a number of notes payable to them as part of the consideration for the sale of lots and mobile homes. The present value of these notes is includible in the petitioners' income in the years in question, as set forth in our findings of fact. Spring City Foundry Co. v. Commissioner,292 U.S. 182 (1934); Key Homes, Inc. v. Commissioner,30 T.C. 109 (1958). The petitioner has presented *394 no evidence to controvert the determination of the Commissioner as to the present value of these notes at the time of sale. The determination of the Commissioner as to the present value of these notes is accordingly upheld. We have redetermined the petitioner's income from these real estate and mobile home activities in our findings of fact.
We are also called upon to redetermine to what extent, if at all, the petitioners may deduct expenses relating to the business of subdividing real estate into lots and sales of such lots and mobile homes which were deducted by them, by H and H and by T.B.M. We have set forth in the findings of fact the expenses which we determined from the evidence to be correct and which the petitioners are entitled to deduct. The next issue is to what extent, if any, petitioners may deduct as business bad debts losses from the worthlessness of promissory notes, the face amounts of which were included in income. The respondent concedes that petitioner's loss as guarantor of any note that may have been discounted to the Nashville City Bank would be deductible under section 166(a). Respondent's only objection is to the year of worthlessness. On careful *395 review of the documentary evidence and the entire record we find the amounts which we have set forth in the findings of fact to be the correct amount and that these amounts became worthless in the years designated. We will next consider to what extent, if any, petitioner may deduct as business or nonbusiness bad debts payments to the Nashville City Bank in satisfaction of petitioner's personal guarantee of repayment of installment promissory notes factored to that bank. We have previously set forth what we have found to be the amounts that the petitioner paid as guarantor of the House of Color installment contracts. We must further decide whether such payments constituted business or nonbusiness bad debts. Respondent concedes that these payments qualify as nonbusiness bad debts, but argues that they do not qualify as business bad debts. Nonbusiness bad debts are equivalent to the loss from the sale or exchange of a short-term capital asset. Sec. 166(d)(1)(B). The regulations provide that if the loss resulting from the debts becoming worthless bears a "proximate" relationship to the conduct of business by the taxpayer, the debt qualifies as a business bad debt. Sec. 1.166-5(b), *396 Income Tax Regs. In determining whether the proximate relationship is present, the Supreme Court in United States v. Generes,405 U.S. 93 (1972), held that the proper standard is one of dominant motive rather than of significant motive. The obligation of Robert Harris as a guarator arose as a result of his being the principal shareholder in T.B.M., who was required by the financial institution acquiring T.B.M's factorable installment purchase agreements to guarantee the corporation's obligation to NCB. The evidence does not show any motive on behalf of the petitioner to act as guarantor of the corporate obligation other than the petitioner's investment motive in T.B.M.The devotion of his time to T.B.M. is not sufficient to bring that within the scope of being his trade or business. The corporation--not Mr. Harris--was engaged in the sale of the goods by installment purchase contracts. Accordingly, the petitioners are entitled to a nonbusiness bad debt in the amounts and for the years previously set forth. The next issue for decision is whether petitioners may deduct the loss sustained in the sale of their personal residence. Section 1.165-9(a), Income Tax Regs. *397 , provides that "a loss sustained on the sale of residential property purchased or constructed by the taxpayer for his use as his personal residence and so used by him to to the time of the sale is not deductible under section 165(a)." We agree. [6]
We must now consider whether the petitioners are required to recapture as ordinary income under section 1250 any portion of the gain they realized from the sale of Wellworth Duplexes. The petitioners' holding period for this property was less than one year. Section 1250(a), as applicable to the years in issue, requires that "additional depreciation" from a property "shall be treated as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231"--i.e., as ordinary income. Section 1250(b)(1) defines "additional depreciation" and provides that depreciation from a property held less than one year will be "additional depreciation." The amounts allowed petitioner as depreciation on *398 the Wellworth property must, therefore, be recaptured as ordinary income under section 1250 upon disposition of the property. The extent to which the petitioners must include income from rents, interest and capital gains in their taxable income for the years at issue are set forth in our findings of fact. The final issue for decision is whether the petitioners are liable for additions to tax under the provisions of sections 6651 and 6653(a). Section 6651 provides an addition to tax for late filing of Federal income tax returns. The petitioners filed their individual returns for 1970, 1971 and 1972 on February 27, February 28 and March 19, 1974, respectively. These returns were not timely filed. There is no evidence that extensions of time for the filing of these returns were granted. Petitioners have presented no evidence to explain this delay which would lead us to the conclusion that these returns were not timely filed for reasonable cause. The Commissioner's determination as to section 6651 is accordingly sustained. Section 6653(a) provides an addition to tax for the underpayment of tax if any part of the underpayment is due to the intentional disregard of rules and *399 regulations or due to negligence. The petitioners did not keep adequate books and records. On review of the evidence we find that the Commissioner's determination as to section 6653(a) must be sustained.[7]
A review of this opinion thus far will reveal that respondent has been successful on every legal issue. A careful examination of the facts, however, demonstrates that this is a hollow victory and underlines the fact that this case should never have been brought to trial and certainly not to opinion. It appears that there are small deficiencies in the petitioners' Federal income tax for the taxable years 1970 and 1971 but that the petitioners have a sizable net operating loss for the taxable year 1972 and may have additional net operating losses is subsequent years. Although the extent to which these net operating losses will offset the deficiencies may be involved in the Rule 155 computation, it appears that there will be little, if any, tax due. Petitioners are also liable for the additions to tax but the amounts of these additions are tied to the amount *400 of the deficiencies. Perhaps the respondent never took the time to look at the whole picture, believing that by winning the legal issues some significant tax must follow. What is clear to this Court is that not only have we been required to devote great time and effort to this futile cause, but Mr. Harris, whom we found to be candid and forthright, has spent eight years of his life pursuing his position in this action. It is true that Mr. Harris kept inadequate records. It is also true that Mr. Harris incorrectly reported his income. But the Commissioner carelessly prepared the statutory notice of deficiency and pursued this matter to trial and opinion even though he could not hope to recover revenue, as Mr. Harris was by then without assets or employment, and the Commissioner could not hope to use this opinion as precedent as the legal issues present no new questions of law. In short, our costly journey through this morass was unnecessary. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended.↩
2. Scott v. Commissioner,T.C. Memo. 1972-109; Perez v. Commissioner,T.C. Memo. 1974-211↩.
3. Although the title documents indicate both Robert and Frances Harris as grantors, we find Robert Harris to be the active party in this enterprise and we will frequently refer to these real estate activities as his business.↩
4. The taxable years indicated are the calendar years on which the petitioners reported their Federal individual income tax.We will use these taxable years as opposed to the corporation fiscal years in view of our finding herein that this income is taxable to petitioners personally and not to the corporation.↩
1. We here total the expenses which the Commissioner's notice of deficiency deemed to be related to the real estate activities of the petitioner. These expenses were claimed by the petitioner on the corporate return of the H and H Development Corporation and in various locations on the joint return.↩
1. We here total he expenses which the Commissioner's notice of deficiency deemed to be related to the real estate activities of the petitioner. These expenses were claimed by the petitioner on both the corporate return of the H and H Development Corporation and in various locations on he joint tax return.↩
5. The Commissioner, in his notice of deficiency, set forth the income from these properties separately from the petitioner's associated basis. We will mention basis herein only to designate amounts which were not allowed in the notice of deficiency. The designation of total income is used to summarize our findings, but these amounts do not take into consideration additional amounts of basis allowed elsewhere and which are not at issue.↩
1. We here total the expenses which the Commissioner's notice of deficiency deemed to be related to the real estate activities of the petitioner. These expenses were claimed by the petitioner on the corporate return of the H and H Development Corporation.↩
6. Shields v. Commissioner,T.C. Memo. 1978-120; Clippinger v. Commissioner,T.C. Memo. 1975-322; and Elliott v. Commissioner,T.C. Memo. 1971-239↩.
7. Potito v. Commissioner,T.C. Memo. 1975-187, affd. 534 F.2d 49↩ (5th Cir. 1976).